**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK LEE, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| SPRINGER NATURE AMERICA, INC., | |
| Defendant. | |

Plaintiff Mark Lee, individually and on behalf of all other similarly situated persons ("Plaintiff"), brings this action against Springer Nature America, Inc. ("Defendant") for its violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA" or "the Act"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. (formerly known as Facebook) ("Meta"), personally identifiable information identifying prerecorded audio visual material Plaintiff and similarly situated subscribers request or obtain from Defendant's website, https://www.scientificamerican.com et. al.[1] (the "Website"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts, upon investigation of counsel, and on information and belief as to all other matters.

## NATURE OF THE CASE

1.     Plaintiff brings this consumer privacy class action to protect the privacy rights granted him under the VPPA, which Defendant violates by knowingly disclosing its subscribers' PII to Meta – specifically, Defendant knowingly disclosed its subscribers' identities alongside information identifying the prerecorded audio visual materials they requested or obtained from the Website.

2.     The VPPA prohibits "video tape service providers," such as Defendant, from "knowingly disclos[ing]" consumers' personally identifiable information ("PII"), defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C.A. § 2710.

3.     Defendant knowingly discloses this information to Meta via the Meta Pixel (formerly known as the Facebook Pixel) ("Pixel")— programing code Defendant knowingly

---

[1] Plaintiff's claims include not only the root website https://www.scientificamerican.com, but also any page included within the website (e.g., https://www.scientificamerican.com/videos/).

installed across its Website that transmits PII to Meta regarding the online website activities Defendant's subscribers perform while visiting the Website – including PII. Defendant purposefully and knowingly implemented the Pixel, making the deliberate decision to send particular categories of information to Meta.

4.     The information Defendant knowingly discloses to Meta includes the subscriber's Facebook ID ("FID") (a number assigned to each Facebook profile which makes the profile easily identifiable) coupled with the title of the prerecorded audio visual material that the subscriber requests or obtains from the Website.

5.     Defendant knowingly discloses, via the Pixel, its subscribers' FIDs and the prerecorded audio visual material they request or obtain, which together constitute personally identifiable information.

6.     Defendant transmits, via the Pixel, the FID and the requested material to Meta together in a single transmission. Because a subscriber's FID uniquely identifies his or her Facebook profile, Meta can use the FID to quickly and easily view a particular subscriber's corresponding Facebook profile. In the simplest terms, Defendant installed the Pixel to collect and disclose to Meta the prerecorded audio visual material its subscribers request or obtain from its Website.

7.     On behalf of himself and all similarly situated subscribers of Defendant, Plaintiff seeks an order enjoining Defendant from further unlawful disclosures of subscribers' PII; awarding liquidated damages in the amount of $2,500 per violation, attorneys' fees, and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES

8.     Plaintiff Mark Lee lives and is domiciled in St. Petersburg, Florida and subscribes to Defendant's Website. He requests or obtains prerecorded audio visual material from the Website using his Internet-connected device and web-browsing software installed on that device ("Browser").

9.     Defendant, Springer Nature America, Inc., is a New York Corporation headquartered at One New York Plaza, Suite 4600, New York, New York, 10004 which owns and operates the Website, through which it collects the PII of its subscribers and knowingly discloses that PII to third parties including Meta. Defendant is "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," and accordingly falls within the VPPA's definition of "video tape service provider." 18 U.S.C. § 2710(a)(4).

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over Defendant because it is incorporated and has its principal place of business in New York, New York.

11.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

12.     Venue is appropriate in this Court because Defendant resides in this District.

## COMMON FACTUAL ALLEGATIONS

### I.  Background of the VPPA

13.     The VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1).

14.     The VPPA was passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase, and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

15.     The First Circuit explained the historical foundation as follows, "Congress enacted the VPPA in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C., newspaper during his confirmation hearings. S. Rep. No. 100–599, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342–1. The profile contained a list of 146 films that Judge Bork and his family had rented from a video store. *Id.* Members of Congress denounced the disclosure as repugnant to the right of privacy. *Id.* at 5–8. Congress then passed the VPPA '[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials.'" *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016).

16.     The Washington City Paper article, entitled The Bork Tapes, was an intrusive rental-by-rental recitation of Judge Bork's video history. Foreshadowing the coming privacy concerns facing Americans today, reporter Michael Dolan offered the following chilling comment: "[t]he only way to figure out what someone is like is to examine what that someone likes — take a hard look at the tools of leisure he uses to chip away life's rough edges."[2] Recent commentators have described the insidious nature of what was previously considered benign information:

> The article attempted to reconstruct the interior life of a U.S. Supreme Court nominee . . . . The list of 146 videotapes Judge Bork

---

[2] Michael Dolan, The Bork Tapes, WASH. CITY PAPER (Sept. 25–Oct. 1, 1987), https://web. archive.org/web/20160313041803/http://theamericanporch.com/bork5.htm [https://perma.cc/37V2- T2ZD].

had rented over the course of two years, leaked by a store clerk, revealed nothing particularly salacious. Judge Bork favored Alfred Hitchcock films, spy thrillers, and British costume dramas; someone in the Bork household had an affinity for John Hughes movies. The list's disclosure hardly intruded upon the sphere of intimate and domestic life protected from government intrusion by Griswold v. Connecticut and its progeny. Yet, against the backdrop of "[o]ne of the fiercest battles ever waged over a Supreme Court nominee," the publication of The Bork Tapes drew bipartisan ire and generated consensus on the importance of intellectual privacy.

The Harvard Law Review Association, C*hapter Three the Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 Harv. L. Rev. 1766 (2018) (discussing the Video Privacy Protection Act's effect on privacy legislation).

17.    While the concerns about privacy were undoubtedly true in 1988 when the VPPA was passed, the importance of privacy legislation in the modern era of data mining is even more pronounced. Indeed, during a 2012 Senate Judiciary Committee meeting entitled "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Patrick Leahy emphasized that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[3]

18.    The privacy rights protected by the VPPA bear a close relationship to the traditional privacy harms actionable in English and American courts, including, "for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v.*

---

[3] Full Committee Hearing, *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law*, U.S. Senate Committee on the Judiciary, (January 31, 2012) https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited June 7, 2024).

*Ramirez*, 594 U.S. 413, 425, 141 S. Ct. 2190, 2204, 210 L. Ed. 568 (2021). Here, the Plaintiff alleges harm associated with the nonconsensual sharing of his private information, an act constituting an outrageous invasion of privacy that is highly offensive to a reasonable person.[4] *Id.*

19.     Simply put, the right to privacy in the audio visual material one requests or obtains is inviolate.  While the privacy protections afforded Americans is a hodgepodge of state and federal common and statutory law, the VPPA is a unique and express protection deemed vital to the First Amendment.

**II.     The Pixel is Designed to Collect Information About Users Online Behavior.**

20.     The Pixel is a unique string of code that operates to disclose subscribers' online activity[5] to Meta, who in turn creates detailed profiles filled with highly personal inferences about the subscribers, such as their "interests," "behavior," and "connections."[6]

21.     After users' activity is transmitted to Meta via the Pixel, Meta compiles the information to identify personalized "audiences" that consist of individuals who are likely to respond to particular advertisers' messaging, improving the ability of businesses to serve specific (i.e., "targeted") subscribers with personalized advertisements. This improves the accuracy and effectiveness of a business's advertising campaigns.

---

[4] *See also* Restatement (Second) of Torts § 652A (Am. Law Inst. 1977) ("Restatement") "[o]ne who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other." Restatement § 652A (1).

[5] Meta, *Meta Pixel*, Meta for Developers (2024) https://developers.facebook.com/docs/meta-pixel/ (last visited June 6, 2024); Meta, *Retargeting: Inspire People to Rediscover What They Love About Your Business*, Meta for Developers (2024) https://www.facebook.com/business/goals/retargeting (Meta Pixel "tracks the people [who visit your website] and the type of actions they take.") (last visited January 30, 2024).

[6] Meta, Audience *Ad Targeting: How to find people most likely to respond to your ad,* Meta for Developers (2024), https://www.facebook.com/business/ads/ad-targeting (last visited January 30, 2024).

22.     Moreover, the Pixel can recognize Defendant's subscribers even when they visit different website across the Internet - and even after a subscriber clears his or her browser history.

23.     Information about a website's users becomes the currency by which Meta and said website exchange value;[7] websites provide information to Meta, and in exchange, Meta provides unmatched advertising capabilities to Defendant. Meta promotes its Pixel as useful to "[f]ind new customers… Drive more sales… [and] reach people who are more likely to take an action you care about, like making a purchase."[8] In fact, it is this very business model that contributed to Meta's *$131.6 billion* advertising revenue in 2023.[9]

**III.  Defendant's Disclosure of PII is Knowing Because It Designed Its Website to Do So.**

24.     Defendant operates its Website in the U.S., accessible via computer browser at https://www.scientificamerican.com/. When Defendant developed its Website, it purposefully installed and programmed the Pixel into its Website operation, thus making the knowing choice to disclose subscribers' PII to Meta.[10]

---

[7]  *See* Ben-Shahar, Omri, *Privacy is the New Money, Thanks to Big Data*, Forbes, https://www.forbes.com/sites/omribenshahar/2016/04/01/privacy-is-the-new-money-thanks-to-big-data/?sh=2229e4853fa2 (last visited June 7, 2024) ("We don't pay old money to use Facebook, Google search, CNET, or Forbes.com. Instead, each of these websites competes for our New Money currency—collecting mountains of information about us when we use their services and commercializing their databases.").

[8]  Meta, *About Meta Pixel*, Meta Business Help Center (2024) https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited March 18, 2024).

[9]  Meta, *Meta Reports Fourth Quarter and Full Year 2023 Results*, Meta Investor Relations https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx#:~:text=For%20the%20full%20year%202023,and%20full%20year%2020 23%2C%20 (last visited June 7, 2024).

[10] Similar to the FID, which identifies a particular Facebook profile, pixels also possess their own unique numeric identifiers. The numerical identifier associated with the Meta Pixel which currently operates on https://www.scientificamerican.com/ et.al. is 128202141081854.

25.      A Pixel does not appear within a website merely by happenstance, indeed, to do so required that Defendant follow detailed instructions as depicted below:[11]



*Figure 1*

26.      There is no reason a business *must* install the Pixel on its website – the Pixel does not facilitate any necessary website operations whatsoever. But embedding the Pixel within a website's code enables a business, like Defendant, to benefit from the collection of measurable data that details how users interact with their websites, such as whether users initiate purchases on

---

[11] Meta Business Help Center, *Use the Facebook Event Setup Tool for Web*, Meta (2024) https://www.facebook.com/business/help/777099232674791?id=1205376682832142 (last visited June 4, 2024); Events Websites can choose to track include: 'Subscribe', 'Add Payment Info', 'Search' and 'View Content' among others. Meta Business Help Center, *Specifications for Meta Pixel standard events*, Meta (2024) https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited June 4, 2024).

the website, what items they view, and, relevant here, the prerecorded audio visual material users request or obtain on a particular webpage.[12]

27.     Defendant invites users to become subscribers to its Website by asking them to submit their name, a valid email address, and payment information.

28.     During the class period, users were required to register and become subscribers in order to watch more than three videos on the Website. To be clear, status as a subscriber was a condition to accessing additional videos, thereby enhancing their viewing experience.

### IV.  How Defendant Discloses Subscribers' PII.

29.     When a subscriber requests or obtains prerecorded audio visual material on Defendant's Website, the Pixel Defendant installed discloses personally identifiable information about the subscriber to Meta, including information identifying the prerecorded audio visual materials the subscriber requests or obtains. Specifically, Defendant sends to Meta the audio visual material name, its URL, and the subscriber's FID.

---

[12] "By default, the Pixel will track URLs visited, domains visited, and the devices your visitors use." Meta for Developers, *Get Started*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/get-started (last visited June 7, 2024). "The Meta Pixel…. relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns. The Meta Pixel can collect the following data: Http Headers – Anything that is generally present in HTTP headers, a standard web protocol sent between any browser request and any server on the internet. This information may include data like IP addresses, information about the web browser, page location, document, referrer and person using the website. Pixel-specific Data – Includes Pixel ID and the Facebook Cookie. Button Click Data – Includes any buttons clicked by site visitors, the labels of those buttons and any pages visited as a result of the button clicks." Meta for Developers, *Meta Pixel*, Meta (2024) https://developers.facebook.com/docs/meta-pixel/ (last visited June 7, 2024).

30.     An FID is a unique and persistent identifier that Meta assigns to each of its users' profiles. With a user's FID in hand, Meta can locate the user's unique Facebook profile.[13] Simply put, with only a FID and the URL containing the name of the audio visual material requested—all which Defendant knowingly provides to Meta—Meta learns the identity of the subscriber and the specific audio visual material he requests or obtains from the Website.

31.     At all relevant times, Defendant knew the Pixel discloses PII to Meta. This is evidenced by, among other things, the inherent purpose and function of the Pixel, which is installed within a website to collect information about how users interact with a website. Additionally, the Pixel as programmed by Defendant on its Website betrays any possibility that Defendant is ignorant of the Pixel's purpose. Indeed, Defendant coded its pixel to collect information beyond the Pixel's default categories that are automatically tracked upon its installation. Defendant's Pixel was programmed to collect "Button Click" data, which tracks when subscribers click buttons or links on the Website. Yet "Button Click" data is not tracked by default – it is only tracked when website developers instruct the Pixel to collect it.

32.     Defendant's knowledge of the Pixel is further evidenced by the fact that Defendant benefitted from the Pixel's purpose, because its Pixel enabled it to target digital advertising to its subscribers (and potential subscribers) based on the material those subscribers previously requested or obtained on the Website, including audio visual materials. Most importantly,

---

[13] The process by which Meta can locate the unique user's Facebook profile is simple enough that an ordinary person can perform this task by entering the FID into the browser's search bar as detailed in Paragraphs 34-35.

Defendant knew the Pixel discloses PII to Meta because when Defendant installed the Pixel code within its webpage, *it selected the specific categories of data to disclose to Meta.*[14]

33.     Relevant here, Defendant, through the Pixel it installed within its Website, disclosed to Meta both the prerecorded audio visual material's title and the subscriber's FID in a single network transmission. This transmission is depicted in the below example:



*Figure 3*

34.     In this example, Defendant knowingly disclosed to Meta that Kendra Marta[15] requested or obtained Defendant's prerecorded audio visual material entitled "Decoded: Aging."

35.     The FID is displayed as a numeric value referred to as the "c_user." In this example the numeric FID associated with Kendra Marta's Facebook profile is 100085022250478:

---

[14] Meta, *Conversion Tracking*, Meta for Developers (2024) https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited January 30, 2024).

[15] For the purposes of demonstrating in this Complaint Defendant's practice of sharing consumers personally identifying information, an exemplary account for "Kendra Marta" was created and utilized.

| | |
|---|---|
| Cookie: | sb=WSjBZOneVDg0RiH0_5UWD4SP; datr=WSjBZJH7FP435WY1fcxXOm1X; ps_n=0; c_user=100085022250478; dpr=1; usida=eyJ2ZXIiOjEsImIkIjoiQXNhZXB4dDFtamFkOTEiLCJ0aW1lIjoxNzEwNTM1ODg5fQ%3D%3D; xs=24%3A2ChPcW5CP8dv4w%3A2%3A1708440978%3A-1%3A-1%3A%3AAcXaslx3uDKO_vSxDLb6tGl7r8oEAeO3AKe19TMxgg; fr=1IAPzmIefrwYtXL0S.AWXbP79xHhLdi8aegcD4rT25xjc.Bl-fAT..AAA.0.0.Bl-fAT.AWWRQ2p4g80 |
| Pragma: | no-cache |
| Referer: | https://www.scientificamerican.com/ |

*Figure 4*

36.     The disclosure of the FID is coupled with the title of the prerecorded audio visual material the subscriber requested or obtained along with the URL to access it:



*Figure 5*

37.     This transmission facilitates Meta's ability to specifically identify the user requesting or obtaining the prerecorded audio visual material "Decoded: Aging" because submitting "Facebook.com/100085022250478" into a browser's search bar, as illustrated in *Figure 6*, will direct the browser to populate Kendra Marta's Facebook profile page, as can be seen in *Figure 7*.



*Figure 6*



*Figure 7*

38.    Therefore, by entering https://www.facebook.com/[FID]/ Meta can identify the specific subscriber requesting or obtaining prerecorded audio visual material.

39.    The PII disclosed by Defendant is personal and unique to Plaintiff and each Class member, and Defendant's choices affect Plaintiff and Class Members' control of information concerning their person. "Most Americans hold strong views about the importance of privacy in their everyday lives,"[16] and 93% of adults believe it is important to have control over who can access information about them.[17]

40.    The VPPA codified a right to privacy in U.S. citizens' PII regardless of the medium through which prerecorded audio visual material is requested or obtained. It imposes responsibilities on video tape service providers, like Defendant, to limit disclosure of PII.

41.    Defendant violates the Video Privacy Protection Act by knowingly disclosing subscribers' PII to Meta in the form of their FIDs, together with the prerecorded audio visual material they request or obtain.

---

[16] Mary Madden & Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance*, Pew Res. Ctr. (May 20, 2015) *see also* EPIC, *Public Opinion on Privacy* (2018).
[17] *Id.*

14

## PLAINTIFF-SPECIFIC ALLEGATIONS

42.     Plaintiff Mark Lee is a subscriber of Defendant's and has been for over ten years.

43.     In order to become a subscriber, the Website required Plaintiff Lee to submit his full name and email address, and then confirm that email address.

44.     Plaintiff Lee requested or obtained prerecorded audio visual materials through his subscription to the Website in the two years preceding the filing of this action.

45.     Plaintiff Lee has had a Facebook profile during the entire time he has been a subscriber of Defendant's. Defendant disclosed to Meta his FID coupled with the title of the prerecorded audio visual material he requested or obtained and the URLs to access that material.

46.     Each time Defendant disclosed his PII to Meta, it violated his rights under the VPPA.

## CLASS ALLEGATIONS

47.     Plaintiff brings this lawsuit under the Rules 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons in the United States who requested or obtained prerecorded audio visual material through a subscription to the Website operated by Defendant and had a Facebook Profile during the period during which the Pixel was active on Defendant's Website.

48.     The "Class Period" is from June 12, 2022, to the present.

49.     Excluded from the Class is Defendant, any controlled person of Defendant, as well as the officers and directors of Defendant and the immediate family members of any such person. Also excluded is any judge who may preside over this cause of action and the immediate family members of any such person. Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

15

50.     **Numerosity**: The Class consists of at least hundreds of individuals, making joinder impractical.

51.     **Commonality and Predominance**: Common questions of law and fact exist with regard to the claim and predominate over questions affecting only individual Class members. Questions common to the Class include:

A.     Whether Defendant knowingly disclosed Plaintiff's and Class members' PII to Meta;

B.     Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; and

C.     Whether Defendant should be enjoined from disclosing Plaintiff's and Class members' PII.

52.     **Typicality**: Plaintiff's claims are typical of the claims of the members of the proposed Class because, among other things, Plaintiff and members of the class sustained similar injuries from Defendant's uniform wrongful conduct, and their legal claims arise from the same events of wrongful conduct by Defendant.

53.     **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and Plaintiff has no interests antagonistic to those of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy-protection cases.

54.     **Predominance and Superiority**: Plaintiff satisfies the requirements of Rule 23(a) as well as the requirements for maintaining a class under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient

adjudication of this controversy. The amount of damages available to individual Plaintiffs is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents the potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

55.     **Injunctive Relief**: Plaintiff also satisfies the requirements for maintaining a class under Rule 23(b)(2). Defendant acted on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

56.     **Particular Issues.** Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). Their claims consist of particular issues that are common to all Class members and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSE OF ACTION
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710

57.     Plaintiff incorporates and realleges the above factual allegations by reference.

58.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

59.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or

delivery of prerecorded video cassette tapes or similar audio visual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering prerecorded audio visual materials and those sales affect interstate or foreign commerce.

60.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiff and Class members are subscribers to Defendant's service which delivers prerecorded audio visual material. Thus, Plaintiff and Class members are "consumers" under this definition.

61.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

62.     Defendant knowingly disclosed Plaintiff's and Class members' PII—specifically, their FIDs and URL identifying the prerecorded audio visual material they requested or obtained— to Meta.

63.     This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to Meta as having requested or obtained Defendant's prerecorded audio visual material, including the specific audio-visual materials requested or obtained on Defendant's Website. Indeed, an ordinary person possessing a class member's FID can identify the individual associated with it simply by entering "Facebook.com/[FID]" into a web browser.

64.     Defendant never obtained from Plaintiff, or any Class member, informed, written consent. More specifically, Defendant never obtained from Plaintiff or any Class member, informed, written consent in a form distinct and separate from any form setting forth other legal

or financial obligations of the consumer; Defendant never obtained from Plaintiff or any Class member, informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiff or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

65.     Defendant's disclosures were made knowingly, as it programmed the Pixel into its Website code, knowing that doing so would disclose to Meta the audio visual material titles and the FIDs pertaining to any subscriber who requested or obtained audio visual material.

66.     By knowingly disclosing Plaintiff's and the Class members' PII, Defendant violated Plaintiff's and Class members' statutorily protected right to request or obtain prerecorded audio visual materials in private. 18 U.S.C. § 2710(c).

67.     Plaintiff and Class members have suffered loss by reason of Defendant's violations, including, but not limited to, violations of their right of privacy, loss of value in their personally identifiable information, and the inequity of Defendant's enrichment by means identifying information pertaining to Plaintiff and Class members without authorization or consent.

68.     As a result of these violations, Defendant is liable to Plaintiff and Class members.

69.     On behalf of himself and all members of the Class, Plaintiff seeks to enjoin Defendant's disclosures of PII; liquidated damages in the amount of $2,500 per violation; reasonable attorneys' fees and costs; and all other preliminary or equitable relief the Court deems appropriate. 18 U.S.C. § 2710(c)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

i.    Certify this case as a class action, and appoint Plaintiff as Class Representatives and the undersigned attorneys as Class Counsel;

ii.    Find that Defendant's actions, as described herein, constitute violations of the VPPA;

ii.    Enter judgment in favor of Plaintiff and the Class;

iii.    Enter an order permanently enjoining Defendant from disclosing PII to third parties in violation of the VPPA;

iv.    Award Plaintiff and Class members the actual and/or statutory damages to which they are entitled under the VPPA;

v.    Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

vi.    Award all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action; and

vii.    Award such other legal and equitable relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable as of right.

Dated: June 12, 2024                    Respectfully submitted,

                                        */s/ Samuel R. Jackson*
                                        Samuel R. Jackson (5332325)
                                        James Allen Carney (*pro hac vice forthcoming*)
                                        CARNEY BATES & PULLIAM, PLLC
                                        One Allied Drive, Suite 1400
                                        Little Rock, AR 72202
                                        Telephone: (501) 312-8500
                                        Facsimile: (501) 312-8505
                                        Email: sjackson@cbplaw.com
                                        Email: acarney@cbplaw.com

                                        *Attorneys for Plaintiff*