**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARK LEE, individually
and on behalf of all others similarly situated,

Plaintiff,

v.

SPRINGER NATURE AMERICA, INC.,

Defendant.

Case No. 1:24-CV-04493-LJL

Hon. Lewis J. Liman

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

**ORAL AGUMENT REQUESTED**

## TABLE OF CONTENTS


I. BACKGROUND .......... 2
II. LEGAL STANDARD .......... 4
a. 12(b)(1) .......... 4
b. 12(b)(6) .......... 5
III. ARGUMENT .......... 5
A. Plaintiff Suffered Injury Sufficient To Confer Standing .......... 7
B. Plaintiff Pleads A Violation Of the VPPA. .......... 9
i. Defendant Is A Videotape Service Provider Subject To The VPPA. .......... 9
ii. Plaintiff Is A Consumer, Protected By The VPPA. .......... 11
iii. Defendant Disclosed Plaintiff's PII to Meta. .......... 14
iv. Defendant's Disclosure of Plaintiff's PII was Knowing .......... 17
C. *Salazar* Presents A Distinct Issue; A Stay Is Inappropriate .......... 20
D. Any Dismissal Must Be Without Prejudice And With Leave To Amend .......... 22
IV. CONCLUSION .......... 23

# TABLE OF AUTHORITIES

## Cases

*Alex v. NFL Enters. LLC,*
No. 1:22-cv-09239-ALC, 2023 WL 6294260 (S.D.N.Y Sept. 27, 2023) .......... 7, 13

*Ambrose v. Boston Globe Media Partners LLC*,
No. 21-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022) .......... 10

*Aponte v. Northeast Radiology, P.C.*,
No. 21-cv-5883-VB, 2022 WL 1556043 (S.D.N.Y. May 16, 2022) .......... 8

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) .......... 7, 11, 22

*Belozerov v. Gannett Co.*,
646 F. Supp.3d 310 (D. Mass. 2022) .......... 9

*Cantu v. Tapestry, Inc.,*
No. 22-cv-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. July 10, 2023) .......... 10

*Carroll v. Gen. Mills, Inc.*,
No. CV23-1746-DSF-MRW, 2023 WL 4361093 (C.D. Cal. June 26, 2023) .......... 10

*Carter v. HealthPort Techs., LLC*,
8232 F.3d 47 (2d. Cir. 2016) .......... 5

*Carter v. Scripps Networks*, *LLC,*
670 F.Supp. 3d 90 (S.D.N.Y. Apr. 24, 2023) .......... 7, 13

*Collins v. Pearson Educ, Inc.*,
No. 23 CIV. 2219 (PAE), 2024 WL 895316 (S.D.N.Y. Mar. 1, 2024) .......... 14, 15

*Czarnionka v. Epoch Times Association, Inc.*,
No. 22 Civ. 6348, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) .......... 18

*Davis v. FEC*,
554 U.S. 724 (2008) .......... 8

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 7, 15, 16

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) .......... 11

*Fan v. NBA Props Inc.*,
No. 23-CV-05069-SI, 2024 WL 1297643 (N.D. Cal. Mar. 26, 2024) ........ 14, 19

*Feldman v. Star Tribune Media Co.*,
659 F.Supp. 3d 1006 (D. Minn. 2023) ........ 8

*Gadelhak v. AT&T Servs, Inc.*,
950 F.3d 458 (7th Cir. 2020) ........ 8

*Gardener v. MeTV*,
681 F.Supp. 3d 864 (N.D. Ill. 2023) ........ 14

*Glick v. CMRE Fin. Servs., Inc.*,
No. 21-cv-7456 (NSR), 2022 WL 2475690 (S.D.N.Y. Jul.. 6, 2022) ........ 8

*Golden v NBC Universal Medial, LLC*,
688 F.Supp.3d 150 (S.D.N.Y. 2023) ........ 13, 14, 18

*Harris v. Pub. Broad. Serv.*,
662 F. Supp. 3d 1327 (N.D. Ga. 2023) ........ 19

*In re Facebook, Inc. Consumer Priv Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 9

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ........ 15

*In re Vizio Consumer Priv. Litig.*,
238 F. Supp.3d 1204 (C.D. Cal. 2017) ........ 10

*In re: Hulu Privacy Litigation*,
86 F.Supp.3d 1090 (N.D. Cal. Mar. 31, 2015) ........ 19

*Jackson v. Fandom, Inc.*,
No. 22-cv-04423-JST, 2023 WL 4670285 (N.D. Cal. July 20, 2023) ........ 9, 10, 14

*Jin v. Metro. Life Ins. Co.,*
310 F.3d 84 (2d Cir. 2002) ........ 22

*Joiner v. NHL Enters, Inc.*,
No. 23CV2083LAKBCM, 2024 WL 639422 (S.D.N.Y. Feb. 15, 2024) ........ 21

*Kappel v. Comfort*,
914 F.Supp. 1056 (S.D.N.Y. 1996) ........ 21

*Lamb v. Forbes Media LLC*,
No. 1:22-cv-06319-ALC, 2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) ................................ 13

*Leslie v. Thompson Reuters Corp.*,
No. 22 CIV. 07936 (JHR), 2023 WL 6173511 (S.D.N.Y. Sept. 22, 2023) ............................. 21

*Lynch v. City of New York*,
952 F.3d 67 (2d Cir. 2020) ......................................................................................................... 5

*Markels v. AARP*,
689 F.Supp. 3d 722 (N.D.Cal 2003) ......................................................................................... 10

*Martin v. Meredith Corp.*,
657 F.Supp.3d 277 (S.D.N.Y. 2023) ........................................................................................... 7

*McCausland v. Gray Media Grp, Inc.*,
No. 22-civ-7539-PGG, 2024 WL 1374765 (S.D.N.Y. Mar. 31, 2024) ..................................... 7

*McLaughlin v. Anderson*,
962 F.2d 187 (2d Cir. 1992) ....................................................................................................... 22

*New York v. U.S. Dep't of Com.*,
315 F. Supp. 3d 766 (S.D.N.Y. 2018) ......................................................................................... 5

*Nike, Inc. v. Already, LLC*,
663 F.3d 89 (2d Cir. 2011) ........................................................................................................... 4

*Robinson v. Disney Online*,
152 F.Supp.3d 176 (S.D.N.Y. 2015) ................................................................................... 16, 17

*Salazar v National Basketball Ass'n*,
685 F.Supp 3d 232 (S.D.N.Y. 2023) ...................................................................................... 4, 12

*Salazar v. National Basketball Ass'n*,
Case. No. 23-1147 (2d Cir.) ....................................................................................................... 20

*Salazar. Lamb v. Forbes Media LLC*,
No. 1:22-CV-06319-ALC, 2024 WL 1364678 (S.D.N.Y. Apr. 1, 2024) ................................ 21

*Sellers v. Bleacher Report, Inc.*,
No. 23-cv-00368, 2023 WL 4850180 (N.D. Cal. July 28, 2023) ....................................... 11, 19

*Shields v. Prof. Bureau of Collections of Maryland, Inc.*,
55 F.4th 823 (10th. Cir. 2022) ..................................................................................................... 8

*Sikhs for Just. v. Nath*,
893 F. Supp. 2d 598 (S.D.N.Y. 2012)........................................................................ 21

*Solomon v. Flipps Media, Inc.*,
No. 22-CV-5508-JMA-JMW, 2023 WL 6390055 (E.D.N.Y. Sept. 30, 2023)........................ 16

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)........................................................................................................ 7

*Sputz v. Alltran Fin., LP*,
No. 21-CV-4663 (CS), 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021)....................................... 8

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)................................................................................................ 5, 7, 8

*Weisz v. Sarma Collections, Inc.*,
No. 21-cv-06230 (PMH), 2022 WL 1173822 (S.D.N.Y. Apr. 20, 2022)................................. 8

*Wilson v. Triller, Inc.*,
598 F. Supp. 3d 82 (S.D.N.Y. 2022)................................................................................ 16

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 f.3d 483 (1st Cir. 2016)........................................................................................... 15

**Statutes**

18 U.S.C. § 2710.......................................................................................................... 1, 5
18 U.S.C. § 2710(a) ..................................................................................................... 6, 11
18 U.S.C. § 2710(a)(3)................................................................................................. 14, 16
18 U.S.C. § 2710(b) .......................................................................................................... 6
18 U.S.C. § 2710(b)(1) ...................................................................................................... 5
18 U.S.C. § 2710(b)(2)(D)................................................................................................ 17
18 U.S.C. §2710(a)(4).................................................................................................... 6, 9

**Rules**

Fed. R. Civ. P. 12(b)(1)...................................................................................................... 4
Fed. R. Civ. P. 12(b)(6)........................................................................................ 2, 5, 6, 13
Fed. R. Civ. P. 15(a)(2)..................................................................................................... 22
Fed. R. Evid. 201(b)......................................................................................................... 12

**Other Authorities**

*Generative AI Models Are Sucking Up Data from All Over the Internet, Yours Included*, Sophie Bushwisk, Lauren Leffer, Tulika Bose, & Elah Feder, October 23, 2023, Scientific American ........................................ 18

*Mental Health Apps Are Not Keeping Your Data Safe*, Piers Gooding & Timothy Kariotis*,* November 15, 2022, Scientific American........................................ 18

*Science Shouldn't Give Data Brokers Cover for Stealing Your Privacy,* Gennie Gebhart & Josh Richman, June 12, 2023, Scientific American........................................ 18

This is a straightforward claim based on a straightforward privacy statute. Defendant Springer Nature America, Inc. ("Springer" or "Defendant") is a media company operating a website featuring "in-depth feature articles, timely news stories, expert opinion and commentary, podcasts, videos, multimedia, photo features and other forms of storytelling" via its website, https://www.scientificamerican.com ("Website").[1] To improve the return on investment from its advertising practices, Defendant embedded the Meta Pixel ("Pixel") within its website. The Pixel is a Meta Platforms, Inc.[2] ("Meta") product which records the interactions of Defendant's unique users and subscribers on its webpages to build detailed profiles about them for purposes of targeted advertising. Critically, the Pixel provides no necessary function for website operations; Defendant had no need to include a Pixel on its website. In fact, the *only* purpose for installing a Pixel within a website is to help websites drive more traffic to their pages, increasing revenue. Defendant installed a Pixel on its website to seek these marketing advantages and configured it to transmit its users' interactions with Meta – transmissions that included the titles of the videos they watched alongside their "Facebook IDs" ("FID"), which uniquely identify the subscribers by their Facebook profiles.

Throughout the proposed class period, Plaintiff Mark Lee ("Plaintiff" or "Mr. Lee") was a Springer subscriber and a Facebook user. He watched videos produced by Springer and published on the Scientific American website, and he did so while he was logged into his Facebook account. Each and every time he watched a video on Springer's website, its Pixel disclosed to Meta the video's title and his FID. In doing so, Springer violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), which prohibits anyone in the business of selling, renting, or delivering

[1] *About Scientific American*, SCIENTIFIC AMERICAN, https://www.scientificamerican.com/page/about-scientific-american/ (last visited Sept. 19, 2024).
[2] Meta Platforms, Inc., formerly known as Facebook, Inc.

videos from disclosing information capable of identifying its subscribers and the video materials they watch absent their informed, written consent. Nothing in Springer's motion to dismiss serves to undermine these well-pled straightforward facts; thus, its motion should be denied in full.

## I. BACKGROUND

Defendant is media company operating the Website, accessible at the web address https://www.scientificamerican.com/. *See* Compl. ¶ 24, ECF No. 1 [3] Defendant produces professional and highly stylized audio visual materials and publishes them for viewing on the Website. *Id.* ¶¶ 9, 29, 33. During the class period, users were required to register and become subscribers to watch more than three videos on the Website. *Id.* ¶ 28. Defendant chose to install the Pixel on its Website. *See id.* ¶¶ 24-26. The Pixel "operates to disclose subscribers' online activity to Meta, who in turn creates detailed profiles filled with highly personal inferences about the subscribers, such as their 'interests,' 'behavior,' and 'connections.'" *Id.* ¶ 20. The collection and analysis of these activities, or "events" as Meta calls them, allows Defendant to take advantage of two services provided by Meta: First, Meta provides analytics information to Defendant about its subscribers and how they interact with its website. *Id.* ¶ 26. Second, any advertising Defendant places through Meta's ad-network is made all-the-more effective because Meta's collection of user-specific interactions on Defendant's website (and the profiles Meta builds for them based on those interactions) ensures Defendant's ads are displayed to the users most likely to respond to them positively. *Id.* ¶¶ 21-23, 26.

[3] Defendant's counterfactual assertions inferred from the Exhibits attached to the Declaration of Sharon Schneier that form the basis of the "Factual Background" section of the Memorandum are inappropriate under Rule 12(b)(6) and are properly disregarded. *See* Plaintiff's Response to Request for Judicial Notice, ECF No. 20.

Defendant's Pixel discloses to Meta a variety of interactions or "events" taken by its subscribers—all of which are transmitted alongside their Facebook IDs. *Id*. ¶¶ 4-6, 29, 33. The transmission of a user's FID makes the particular user identifiable, because a FID is a unique numerical value assigned to the specific user's Facebook profile. *Id*. ¶ 30. When transmitted by the Pixel the FID is preceded by the label "c_user" in the transmission. *Id*. ¶¶ 30, 35. Anyone in possession of a Facebook ID can merely type "facebook.com/" into a web browser followed by the Facebook ID to see a person's Facebook profile page (i.e., www.facebook.com/[FID]). *Id.* ¶¶ 35-38.

Some "events" Defendant configured its Pixel to transmit include information containing the titles and URL addresses of the videos its subscribers request or obtain from the Website. *Id*. ¶¶ 4, 6, 33, 36, 65. Defendant discloses the video title in plain English. *See id*. ¶¶ 33-36. Meta does not receive the video titles and the FIDs in separate transmissions, but in a singular transmission that links the datapoints with each other (i.e., FID #123456 requested video title "ABCDE"). *Id*. ¶ 33-35.

Defendant knowingly installed the Pixel on its website and knowingly configured the product to transmit specific "events" to Meta. *Id*. ¶¶ 24-26. Again, "[t]here is no reason a business *must* install the Pixel on its website – the Pixel does not facilitate any necessary website operations whatsoever. But embedding the Pixel within a website's code enables [Defendant] to benefit from the collection of… data that details how users interact with their websites." *Id.* ¶ 26. Indeed, Defendant specifically programmed the Pixel on its Website "knowing that doing so would disclose to Meta the audio visual material titles and the FIDs pertaining to any subscriber" by virtue of the Pixel's operation whenever the subscriber requested a video. *Id*. ¶ 65. In other words, Defendant "knew the Pixel disclose[d] PII to Meta." *Id*. ¶ 31. "This is evidenced by, among other

things, the inherent purpose and function of the Pixel, which is installed within a website to collect information about how users interact with [that] website" *Id*. ¶ 31. This enable[d Defendant] to target digital advertising to its subscribers… based on the material those subscribers previously requested or obtained on the Website, including audio visual materials." *Id*. ¶ 32.

More than a decade ago, Plaintiff established a deliberate and durable relationship with Scientific American by becoming a subscriber, which provided him access to videos he would not have been able to otherwise access without such a subscription.[4] Compl. ¶¶ 28, 42, 44. To become a subscriber, Plaintiff created an account with Scientific American, which required he provide Defendant with his full name and his email address. *Id*. ¶ 43. In so doing, he obtained a Scientific American account which he used to login and access Defendant's unlimited video streaming services. *Id*. ¶ 44. Plaintiff was simultaneously a Facebook user, to whom Facebook assigned a unique FID linked to his Facebook profile. *Id*. ¶ 45. Each and every time he requested a video, Defendant, through its Pixel, disclosed to Meta his FID, which leads directly to his Facebook profile, and the titles of the videos he watched. *Id*.

## II. LEGAL STANDARD

### a. 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests whether a federal court has the statutory or constitutional power to adjudicate a claim. *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011). In determining whether subject matter jurisdiction exists, "the court must accept as true all material allegations in the complaint and draw all reasonable inferences in favor of the plaintiff." *Salazar v. National Basketball Association*, 685 F.Supp.3d

[4] Plaintiff does not allege a subscription required payment of a monetary subscription fee, nor need he. *See* Section III.B.ii.

2332, 238 (S.D.N.Y. 2023) (quoting *Carter v. HealthPort Techs., LLC*, 8232 F.3d 47, 56-57 (2d. Cir. 2016).

**b. 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *New York v. U.S. Dep't of Com.*, 315 F. Supp. 3d 766, 780 (S.D.N.Y. 2018). A complaint is legally sufficient when its well-pleaded, nonconclusory allegations—taken as true and with all reasonable inferences drawn in plaintiff's favor—plausibly state a claim to relief by raising "more than a sheer possibility" that discovery will reveal evidence of wrongdoing. *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020).

## III. ARGUMENT

In 1988, Congress passed the VPPA, to protect individuals from violations of privacy as to the video-watching choices they make. 18 U.S.C. § 2710. Fundamentally, this law protects individuals from the disclosure of their private information, by prohibiting videotape service providers from disclosing information which identifies a person as having requested or obtained video materials. *Id.* § 2710(b)(1). Defendant, a media company which publishes videos on its website as part of its business, discloses to Meta the videos requested and obtained by each of its unique users every time they do so. Compl. ¶ 29. Plaintiff's allegations are well within the scope of this statute, and the violation of his privacy is exactly the injury protected by the VPPA. Because the interests protected by the VPPA are so closely related to a harm traditionally providing a basis for suit (e.g., "disclosure of private information", *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)), courts have universally held that allegations of VPPA violations confer Article III standing.

The VPPA prohibits, with certain exceptions not applicable here, a "video tape service provider" from "knowingly disclos[ing], to any person," the "personally identifiable information" or "PII" of "consumers." 18 U.S.C. § 2710(a)–(b). That is exactly what Springer did here. First, Defendant created video content as a core component of its online business and delivered it to subscribers, thereby rendering it a videotape service provider. *See* 18 U.S.C. §2710(a)(4). Next, providing personal information to obtain a subscription was a requirement for Plaintiff or class members to access unlimited video content not otherwise available to non-subscribers, and, accordingly, Mr. Lee's provision of his personal information to become a subscriber makes him a consumer under the statute. *See infra* Section III.B.ii. Further, as courts have repeatedly held, a Facebook ID is personally identifiable because it allows anyone with a web browser to identify a user by linking directly to his or her personal Facebook page. Finally, Springer disclosed that information "knowingly" because, as a sophisticated provider of streaming video and other content, it knew (or at any rate Plaintiff's allegations raise the plausible liklihood that it knew) what the Pixel does before installing it.

The gravamen of Defendant's Factual Background and its 12(b)(6) arguments—that "Plaintiff never actually pleads that his video-viewing information was transmitted to Meta," Memorandum of Law in Supp. of Mot. To Dismiss at 5 ("MTD"), and that "[plaintiff] has not alleged that signing up to the Website was a precondition to accessing the videos," MTD at 3—completely ignores Plaintiff's straightforward allegations in paragraphs 5 and 28, respectively. Springer's arguments ignore the VPPA's text, its own cited authorities, Lee's well pleaded allegations, common sense, or all four. It further draws every inference (including speculative, unreasonable inferences) in its own favor. Springer's motion should be denied.

### A. Plaintiff Suffered Injury Sufficient To Confer Standing

Because the VPPA guards a legally protected interest (privacy in video-selection behavior) the violation of which causes injury (disclosure of private information), courts in this District and throughout the country have *universally held* that VPPA claims like those asserted by Plaintiff involving disclosures of PII via the Pixel satisfy the standing requirement that Plaintiff have suffered an injury-in-fact. *See, e.g., Martin v. Meredith Corp.*, 657 F.Supp.3d 277, 283 (S.D.N.Y. 2023) ("[A]llegations that the defendants disclosed his private information to a third party without his consent are sufficient to confer standing.") (citing *TransUnion*, 594 U.S. at 425); *Carter v. Scripps Networks*, *LLC,* 670 F.Supp. 3d 90, 95 (S.D.N.Y. Apr. 24, 2023); *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 666 (S.D.N.Y. 2015); *Alex v. NFL Enters. LLC,* No. 1:22-cv-09239-ALC, 2023 WL 6294260 at *3 (S.D.N.Y Sept. 27, 2023); *McCausland v. Gray Media Grp, Inc.*, No. 22-civ-7539-PGG, 2024 WL 1374765, at *5 (S.D.N.Y. Mar. 31, 2024); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017). Ignoring the reality that every court to address the issue has found a violation of the VPPA causes an injury-in-fact to a plaintiff, Defendant nonetheless argues this court is an improper forum to weigh the merits of his action. MTD at 7-11. These arguments do not support its position.

To establish Article III standing, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). To determine whether an injury is sufficiently concrete, courts ask whether the asserted injury has "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. at 433. Moreover, TransUnion simply requires that a statutory violation have a "close relationship" with traditional harms, not a verbatim,

element-by-element analog. *See Sputz v. Alltran Fin., LP*, No. 21-CV-4663 (CS), 2021 WL 5772033, at *2 (S.D.N.Y. Dec. 5, 2021) ("[T]he injury need not be "an exact duplicate" of the common-law harm.") (quoting *TransUnion*, 594 U.S. at 433). "Chief" among the intangible harms traditionally recognized as actionable in American courts include "disclosure of private information" and "intrusion upon seclusion." *TransUnion*, 594 U.S. at 425 (citing *Davis v. FEC*, 554 U.S. 724, 733 (2008) and *Gadelhak v. AT&T Servs, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020)). These are precisely the harms protected by the VPPA.

Tellingly, Defendant fails to provide any authority dismissing a VPPA claim for lack of standing, which is unsurprising in light of decisions holding VPPA violations inflict a concrete injury – a conclusion "supported by every federal circuit court that has considered the issue." *Feldman v. Star Tribune Media Co*., 659 F.Supp. 3d 1006, 1015 (D. Minn. 2023). Defendant's citation of a handful of decisions parsing the elements of common law causes of action, MTD at 9-11, are simply inapposite both for disclosure of private facts[5] and intrusion upon seclusion,[6] as

[5] Defendant's authorities, based on violations of the regulatory framework of the FDCPA, *Sputz v. Alltran Fin., LP*, No. 21-cv-4663-CS, 2021 WL 5772033 (S.D.N.Y. Dec. 5, 2021), *Weisz v. Sarma Collections, Inc.*, No. 21-cv-06230 (PMH), 2022 WL 1173822 (S.D.N.Y. Apr. 20, 2022); and *Glick v. CMRE Fin. Servs., Inc.*, No. 21-cv-7456 (NSR), 2022 WL 2475690 (S.D.N.Y. Jul.. 6, 2022) are no help to Defendant as Plaintiff here does not merely plead a "procedural violation" of the VPPA, and *clearly* pleads his personal information was made public when Defendant disclosed it not to an affiliate, but to a third party, Meta, for the purpose of Meta sharing the information gleaned to advertise products.

[6] Likewise, *Shields v. Prof. Bureau of Collections of Maryland, Inc*. concerned the disclosure of personal information to a debt collector's direct-mail contractor in violation of the FDCPA, a regulatory framework, 55 F.4th 823 (10th. Cir. 2022), an intrusion far afield from the disclosure of Plaintiff's PII to Meta, whose entire purpose is to share its knowledge gained from receipt of such PII with the advertising community. Equally problematic for Defendant is *Aponte v. Northeast Radiology, P.C.*, which involved a data breach where the defendant's resources were improperly accessed by a criminal third party, No. 21-cv-5883-VB, 2022 WL 1556043 (S.D.N.Y. May 16, 2022); alternatively, Mr. Lee argues Springer engaged in the wrongful act when it knowingly and deliberately disclosed his information to a third party for purposes of advertising.

the authorities cited above make certain that the VPPA bears a close historical analog to these venerable common law claims.

**B. Plaintiff Pleads A Violation Of the VPPA.**

i. Defendant Is A Videotape Service Provider Subject To The VPPA.

The Complaint makes clear that Defendant is a "video tape service provider" ("VTSP") under the VPPA because, as an operator of the Website where subscribers view the recorded audiovisual content it produces, Defendant is a "person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." Compl. ¶ 9, 33; *see* 18 U.S.C. § 2710(a)(4). Springer does not contest Plaintiff's allegations that it delivers audio visual materials (as evidenced by the screen shots of video content and attendant network traffic set forth in Plaintiff's allegations, Compl. ¶ 33, *Figure 3*), but rather argues it does not qualify under the statute because the primary focus of its work is not the production of videos.[7]

Courts have routinely denied motions to dismiss allegations that websites which publish pre-recorded content qualify as "video tape service providers." *Jackson v. Fandom, Inc.*, No. 22-cv-04423-JST, 2023 WL 4670285, at *3 (N.D. Cal. July 20, 2023); *see also In re Facebook, Inc. Consumer Priv Litig.*, 402 F. Supp. 3d 767, 798-99 (N.D. Cal. 2019) (holding that a social media company was a video tape service provider). Contrary to Defendant's assertion, this standard applies equally to "news" organizations.[8] *E.g., Belozerov v. Gannett Co.*, 646 F. Supp.3d 310, 313-

---

[7] This argument is fatally undermined by Defendant's own (improper) attempt to introduce extrinsic evidence to support its arguments that Plaintiff is not a consumer: most of the exhibits reveal its website offers *numerous* self-produced, highly stylized videos for viewing by its subscribers. Naturally, this argument fails.

[8] The VPPA includes no exception to its application to news organizations and Plaintiff is unaware of *any* caselaw supporting this assertion.

14 (D. Mass. 2022) (holding that USA Today online was video tape service provider); *Ambrose v. Boston Globe Media Partners LLC*, No. 21-10810-RGS, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (same regarding Boston Globe).

Defendant asserts it is not a video tape service provider because it focuses on print magazine and articles. However, nothing in the statutory definition requires the entity to focus on the delivery of video content distinct from other types of content, or even other products or services. *See In re Vizio Consumer Priv. Litig.*, 238 F. Supp.3d 1204, 1221-22 (C.D. Cal. 2017) (holding that a maker of "Smart TVs" has delivery of video materials as a "particular field of endeavor" and is therefore a videotape service provider even for delivering content created by third parties via its products). Instead, courts interpreting "deliver" in this context have required that "the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *Jackson*, 2023 WL 4670285, at *3 (quoting *Vizio*, 238 F. Supp. 3d at 1221). Springer designed a website to deliver information to its subscribers, including articles and videos, and through such website subscribers can access the video content Springer produced, which is relevant to and supports its overall business. *Stark*, 635 F. Supp. 3d at 852 ("[D]eveloping a website to deliver video content requires . . . significant 'tailor[ing] to serve that purpose[.]'").

Moreover, the video content in question is not simply marketing or advertising material for Defendant's retail products, nor is the content supporting some separate, distinct entity, like a charitable entity, such as those at issue in Defendant's cited authorities. *See* MTD at 12 (citing *Carroll v. Gen. Mills, Inc.*, No. CV23-1746-DSF-MRW, 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023); *Cantu v. Tapestry, Inc.,* No. 22-cv-1974-BAS-DDL, 2023 WL 4440662 (S.D. Cal. July 10, 2023); *Markels v. AARP*, 689 F.Supp. 3d 722 (N.D.Cal 2003)). No, Defendant's videos are

directly related to its business. Compl. ¶ 33, *Figure 3* (figure illustrating video content supporting Defendant's article *Decoded: Aging*). This places the videos at issue in this case at the heart of the overall product offered by Defendant, as opposed to videos offered in support of or on behalf of an entirely different purpose or entity. Indeed, this is precisely the distinction reached by the Court in *Sellers v. Bleacher Report, Inc.*, No. 23-cv-00368, 2023 WL 4850180 (N.D. Cal. July 28, 2023). *Sellers* distinguished between websites that provide audio visual media that is "incidental to their primary business" (such as retail websites) and newspapers (such as *The Boston Globe*—or Defendants' websites here). *Id*. at *6 ("At the very least," the argument that Bleacher Report is not a video tape service provider "raises factual questions" that are "premature at the motion to dismiss stage.").

ii. Plaintiff Is A Consumer, Protected By The VPPA.

The VPPA defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. 2710(a)(1). The VPPA does not define "subscriber," but courts have examined the following non-dispositive factors as evidence of such a relationship: "sign[ing] up, register[ing] for an account, establish[ing] a user ID or profile, download[ing] an app or program, or tak[ing] any action to associate herself with [the provider]." *Austin-Spearman*, 98 F. Supp. 3d at 669 (internal quotation marks omitted). "Subscriptions involve some or most of the following factors: payment, registration, commitment, delivery, expressed association, and/or access to restricted content." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) (cleaned up).[9] Critically, the Complaint alleges that "[d]uring the class period, users were required to register and become subscribers in order to watch

[9] To the extent Defendant argues that qualification as a subscriber required Plaintiff to have exchanged money with Defendant, it is mistaken "[P]ayment is not a necessary element of subscription." *Ellis*, 803 F.3d at 1256; and *Austin Spearman*, 98 F.Supp. 3d. at 669.

more than three videos on the Website. To be clear, status as a subscriber was a condition to accessing additional videos, thereby enhancing their viewing experience." Compl. ¶ 28. This alone is sufficient to demonstrate Plaintiff is a subscriber.

Ignoring this allegation, Defendant argues Mr. Lee does not qualify as a subscriber because "merely viewing publicly available videos" is too tenuous a relationship to satisfy the VPPA. Defendant's counterfactual assertions, ostensibly supported by the Exhibits supplied by counsel, are inappropriate for consideration by the Court.[10] Taking Plaintiff's allegations as true, as the Court must, a visitor to the Website was prohibited from watching unlimited video content absent a subscription, obtained by sharing personal information to create an account and establish a profile. The analysis ends there: Plaintiff received the benefit of accessing unlimited video content in exchange for signing up for a subscription.

Moreover, the language of the VPPA makes **no distinction** between subscribers to a VTSP's audio visual goods and services or its other non-video-based goods and services: so long as an individual qualifies as a "consumer," the VPPA protects individuals from the disclosure of their PII. The only question relevant to this issue is whether Plaintiff subscribed to a good or service of Defendant's. This question turns on whether Plaintiff having provided his full name and email to Defendant qualifies him as a subscriber where doing so granted him access to restricted materials not available to non-subscribers. The answer here is simple: it does.

Accordingly, the allegations giving rise to the court's recent decision in *Salazar v National Basketball Ass'n*, 685 F.Supp 3d 232, 244-45 (S.D.N.Y. 2023) are substantively dissimilar to those presented here: *Salazar* involves the issue of whether the VPPA requires a connection between a

[10] That Scientific American offered unrestricted content to all, however, is far from "a fact that is not subject to reasonable dispute." Fed. R. Evid. 201(b).

plaintiff's subscription and the video content requested or obtained. *Salazar*, 685 F.Supp.3d at 244-245 (holding that plaintiff did not qualify as a subscriber because the newsletter for which he provided his personal information did not include videos nor did it provide access to any additional benefits or video material unavailable to individuals who did not subscribe to the newsletter). This issue is nonexistent here: Mr. Lee did not subscribe to a separate marketing product, such as a newsletter providing no access to video content above and beyond that available to non-subscribers – he provided his personal information and created an account to obtain a subscription which granted him unrestricted access to videos. This makes the forthcoming decision in *Salazar*, whether in favor of Plaintiff or Defendant, inapplicable.

Indeed, Defendant concedes that the court in *Salazar* determined that "plaintiff had the same access to the videos on the NBA.com site as any other visitor" because the plaintiff had not alleged "the video content [plaintiff] accessed was exclusive to a subscribership." This conclusion stands in sharp contrast Plaintiff's allegations that "status as a subscriber was a condition to accessing additional videos." Compl. ¶ 28. Defendant ignores these allegations with the exception of a passing reference in a footnote, where it improperly contests the matter by referencing a handful of static, historical screenshots from the Website. Ignoring the reality that these screen shots offer no information regarding whether access to all video content was available to nonsubscribers, such factual dispute is of course improper at the Rule 12(b)(6) stage and should be summarily rejected.[11]

[11] Each of the additional decisions cited by Defendant involve circumstances materially different from the matter at bar, and accordingly are simply inapposite. *Carter*, 670 F.Supp. 3d at 96-100 (subscription not required to access videos or gave extra benefits to viewers); *Lamb v. Forbes Media LLC*, No. 1:22-cv-06319-ALC, 2023 WL 6318033, at 11-14 (S.D.N.Y. Sept. 28, 2023) (plaintiff did not adequately plead that subscription was 'connected to [his] ability to access video content"); *Alex*, 2023 WL 6294260, at *3-4 (same); *Golden v NBC Universal Medial, LLC*, 688 F.Supp.3d 150, 166 (S.D.N.Y. 2023) (plaintiff not subscriber because complaint did not allege that

iii. <u>Defendant Disclosed Plaintiff's PII to Meta.</u>

In no uncertain terms, Plaintiff alleges that when he watched videos on the Website, Defendant's Pixel sent Meta a network transmission including both the title of the video he watched and his FID. Compl. ¶33. This transmission constitutes PII, which "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Despite the plain language of the definition, Defendant argues these allegations fail because Plaintiff has not alleged any additional identifying information was made known through this transmission. Consistent with the vast majority of decisions in related actions, this argument fails.

The transmission of a video's title adjacent to a FID constitutes a disclosure of PII because it identifies a particular, unique individual as having watched a certain video. Moreover, the FID here does not identify a person named Mark Lee, but identifies *Plaintiff* Mark Lee—a clear illustration that the disclosure of an individual's FID is more identifying than the transmission of a person's name. Unsurprisingly, in light of the breadth of the statutory language and the ease with which Facebook IDs are associated with specific Facebook users, district courts, including many within the Southern District of New York, have concluded that allegations including the transmission of Facebook IDs constitute personally identifiable information under the VPPA. *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 159 (S.D.N.Y. 2023) (collecting cases); *Collins v. Pearson Educ, Inc.*, No. 23 CIV. 2219 (PAE), 2024 WL 895316, at *8 (S.D.N.Y. Mar. 1, 2024); *Fan v. NBA Props Inc.*, No. 23-CV-05069-SI, 2024 WL 1297643, at *2 (N.D. Cal. Mar. 26, 2024); *Jackson*, 2023 WL 4670285.

---

defendant had to sign up for defendant's app to access video content); *Gardener v. MeTV*, 681 F.Supp. 3d 864, 869 (N.D. Ill. 2023) ("subscriptions . . . unconnected to their ability to access video content").

Defendant makes one substantive argument[12] for its proposition that Plaintiff's allegations fail to allege a disclosure of PII—that the FID Plaintiff alleges Defendant transmitted to Meta does not identify him sufficient to invoke the protections of the VPPA for two reasons: First, that Meta has to take an "extra step" and enter the FID into the Facebook URL[13] and second, that the FID does not include any of Mark Lee's personal information. MTD at 19. Two standards have developed with regard to whether data constitutes PII, the First Circuit's broader approach, which looks to whether the information transmitted is "reasonably and foreseeably likely to reveal which videos a person has obtained," *Golden v. NBC Universal Media, LLC*, 688 F.Supp.3d 150, 159 (S.D.N.Y. 2023) (quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 f.3d 483, 486 (1st Cir. 2016) (internal quotations removed), and the Third and Ninth Circuits' narrower "ordinary person standard," which requires "disclosure of the kind of information that would readily permit an ordinary person to identify a specific individuals' video-watching behavior." *Id*. (quoting *Nickelodeon*, 827 F.3d at 290; and *Eichenberger*, 876 F.3d at 985). An approach has not yet been adopted by the Second Circuit. *Id*.

Defendant argues Plaintiff fails to satisfy the ordinary person standard, but, at best, Defendant misstates this standard, which is focused primarily on whether the information disclosed by the videotape service provider is capable of being used to identify a person without requiring the combination of additional datapoints. *Eichenberger*, 876 F.3d at 986 (examining the ordinary

---

[12] Defendant actually makes two arguments but did not commit to its first throwaway argument that Plaintiff failed to allege the specific video materials he requested or obtained. Even so, this argument also fails. *See Collins*, 2024 WL 895316 at *6 (finding that allegations lacking the specific video titles transferred by the pixel did not fail to put defendant on notice of the factual basis for the claim and sufficient to allow defendant to defend the case).

[13] Plaintiff's allegations illustrate how simple the process is to create the link to the particular user's Facebook profile, Compl. ¶ 37-38, which is a far cry from Defendant's assertion the process constitutes "reverse engineering."

person standard based on the transmission of a device serial number which can be used to identify a person, but only by combining the number with various additional information collected by the recipient); and *Robinson v. Disney Online*, 152 F.Supp.3d 176, 183-84 (S.D.N.Y. 2015) (same). Defendant focuses its efforts next by asserting that Plaintiff fails to allege his FID sufficiently identifies him, but this is contrary to the weight of authority in this District and across the country which has found disclosure of an FID constitutes information which can identify an individual. *Golden*, 688 F.Supp.3d at 159 ("Courts have uniformly held Facebook IDs to constitute PII under the VPPA, particularly where…the plaintiff alleges that her Facebook ID was disclosed alongside the viewed video's URL and name.") (collecting cases). Just like the allegations in those cases, Plaintiff alleges his FID was transmitted alongside the titles and URLs of the videos he watched. Compl. ¶ 45. These allegations prevail under either standard.

Despite admitting a "link to a Facebook profile" would make a person identifiable, MTD at 5, Defendant continues, suggesting that liability under the VPPA requires infallible identification of a unique person. MTD at 18-20. Critically, Defendant's authorities for this proposition, *Solomon v. Flipps Media, Inc.*, No. 22-CV-5508-JMA-JMW, 2023 WL 6390055 (E.D.N.Y. Sept. 30, 2023) and *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82 (S.D.N.Y. 2022), represent the *minority* view in these cases, and Defendant's proposition is unsupported by the large majority of case law interpreting the VPPA. 18 U.S.C. § 2710(a)(3) (defining PII as "including" information "which identifies a person as having requested…video[s]"); *Eichenberger*, 876 F.3d at 984 ("[T]he open-ended word 'includes' ... suggests that the proffered definition describes only one example of 'personally identifiable information.'"). Defendant's reasoning here is further impracticable, as it would impose liability only upon identification of a person to a certainty, which, if correct, would require disclosure of multiple, cross-referenceable datapoints and would

conflict with the "ordinary person" standard, as well as the text of the VPPA itself, 18 U.S.C. § 2710(b)(2)(D), which references "names and addresses of consumers" – neither of which identify any particular, unique person. *See Robinson*, 152 F.Supp.3d at 181.

Plaintiff's allegations illustrate a simple and clear connection between his FID and the videos he watched. Any person (not just Meta) in possession of the information Springer disclosed to Meta is made capable of learning that not just Mark Lee, but *Plaintiff Mark Lee* (via the FID linked to his personal Facebook profile) watched specific video titles on the Website. *Robinson* 152 F.Supp.3d at 184 ("[A] FID is equivalent to a name – it stands in for a specific person.")

iv. Defendant's Disclosure of Plaintiff's PII was Knowing.

Like so many other websites, Defendant installed its Pixel because doing so allowed it to retarget specific individuals who visited its site with advertising. Plaintiff alleges Springer programmed the Pixel on its website knowing that Meta would receive video titles and the subscriber's FIDs by virtue of the Pixel's operation whenever the subscriber watched a video. Compl. ¶ 65. Plaintiff's Complaint contains *fulsome* allegations detailing that Defendant was aware that its use of the Pixel would provide Meta with information about how its unique users (i.e., not its user-base generally) interacted with its web-based material. Compl. ¶¶ 24-28. And, because it shared this information, Meta would help ensure advertisements Springer placed using Meta's ad-network would be directed back to those specific users based on the things they did. *Id.* ¶¶ 21-23. If these allegations are true - and the Court is required to assume they are at this stage – then Springer "knowingly" disclosed Lee's protected information in violation of the VPPA.

Dissatisfied with these allegations, Springer (again, a media company that writes at length about issues of technology, *including improper data collection*[14]) simply ignores them. Springer blithely asserts that "Plaintiff has not alleged Springer even knew the Facebook ID existed[,] much less that Springer ... knew it was transmitted" via the Pixel. MTD at 10. But that is precisely what Lee alleges: Springer "kn[ew]" that the Pixel "would disclose to Meta the audio visual material titles and the FIDs pertaining to any subscriber who requested or obtained audio visual material." Compl. ¶ 65. Springer likewise insists that the Complaint must, but does not, allege that Springer knew the "nature of the information actually disclosed." MTD at 10.

Courts have *routinely* rejected defendants' arguments in substantively identical circumstances. *See Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 161–62 (S.D.N.Y. 2023) ("[T]he FAC alleges that [defendant] took affirmative steps to install… and program the Facebook pixel to collect and transmit information regarding each visitor's on-demand video viewing… and that it did so to profit from advertising and information services… with the understanding that the pixel would transmit users' information to Facebook… That is sufficient to allege [defendant] acted 'knowingly.'"); *Czarnionka v. Epoch Times Association, Inc.*, No. 22 Civ. 6348, 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022) motion to certify appeal denied, No. 22 CIV.6348 (AKH), 2022 WL 17718689 (S.D.N.Y. Dec. 15, 2022); *Sellers v. Bleacher Rep.,*

---

[14] *See Mental Health Apps Are Not Keeping Your Data Safe*, Piers Gooding & Timothy Kariotis, November 15, 2022, Scientific American, https://www.scientificamerican.com/article/mental-health-apps-are-not-keeping-your-data-safe/ (last accessed September 20, 2024); *Science Shouldn't Give Data Brokers Cover for Stealing Your Privacy,* Gennie Gebhart & Josh Richman, June 12, 2023, Scientific American, https://www.scientificamerican.com/article/science-shouldnt-give-data-brokers-cover-for-stealing-your-privacy/ (last accessed September 20, 2024); and *Generative AI Models Are Sucking Up Data from All Over the Internet, Yours Included*, Sophie Bushwisk, Lauren Leffer, Tulika Bose, & Elah Feder, October 23, 2023, Scientific American, https://www.scientificamerican.com/podcast/episode/generative-ai-models-are-sucking-data-up-from-all-over-the-internet-yours-included/ (last accessed September 20, 2024).

*Inc.*, No. 23-CV-00368-SI, 2023 WL 4850180, at *5 (N.D. Cal. July 28, 2023); *Fan v. NBA Props Inc.*, No. 23-CV-05069-SI, 2024 WL 1297643, at *2 (N.D. Cal. Mar. 26, 2024); and *Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, 1336 (N.D. Ga. 2023).

It is important to note that Defendant's authority here, *In re: Hulu Privacy Litigation*, rendered its judgment in response to the defendant's motion for summary judgment – a completely different and heightened standard than that required at the motion to dismiss. 86 F.Supp.3d 1090 (N.D. Cal. Mar. 31, 2015). Even so, knowledge that its Pixel transmitted PII to Meta is exactly what the Complaint alleges: Springer knew the Pixel "disclosed PII" to Meta, Compl. ¶ 31, among other reasons because Springer knew what it was getting when it installed the Pixel: "to target digital advertising to its subscribers." *Id.* ¶ 32, *see also* ¶¶ 20-25, 31-32 (alleging the steps Defendant took to install and configure the pixel, some of which required specialized knowledge to select non-default categories for disclosure).

Springer also attempts to escape liability for its decisions by resorting to pointing its finger at the Pixel for disclosing this sensitive information. MTD at 21. This assertion is devoid of any support from Plaintiff's allegations and suggests the Pixel appeared within its website code out of thin air. In light of Plaintiff's *clear* and *substantial* allegations that **Defendant knowingly installed the Pixel to obtain the marketing benefits associated with it**, this defense is a waste of time and paper. Compl. ¶¶ 24 ("Defendant…purposefully installed and programmed the Pixel into its website operation, thus making the knowing choice to disclose subscribers' PII to Meta."); ¶ 25 ("A Pixel does not appear within a website merely by happenstance, indeed to do so required that Defendant follow detailed instructions[.]"); ¶ 26 ("[E]mbedding the Pixel within a website's code enables [Defendant] to benefit from the collection of [] data that details how users interact with their websites, such as…the prerecorded audio visual material users request or obtain[.]"); ¶

31 ("Defendant knew the Pixel discloses PII to Meta. This is evidenced by…the Pixel as programmed by Defendant on its Website [which] betrays any possibility that Defendant is ignorant of the Pixel's purpose. Indeed, Defendant coded its pixel to collect information beyond the Pixels' default categories[.]").

Ultimately, Springer invites the Court to assume that Springer - a sophisticated media company that provides streaming video services about science and technology to its subscribers - has no idea what technology it installed on its website or how that technology works. Even were that assumption not directly contradicted by Plaintiff's allegations, it would amount to nothing more than speculation (in Springer's favor which is inappropriate at this stage) – untethered from ordinary expectations and common sense. That assumption is simply implausible. In light of Plaintiffs' clear and substantial allegations that illustrate Defendant was aware of its actions and the consequences, Plaintiff's Complaint makes this knowledge not merely plausible, but probable.

**C. *Salazar* Presents A Distinct Issue; A Stay Is Inappropriate**

Defendant concludes its briefing with a request that consideration of the motion to dismiss be stayed pending the Second Circuit's decision in *Salazar v. National Basketball Ass'n*, Case. No. 23-1147 (2d Cir.). Because the issues on appeal are substantively distinct from those at bar, such a stay would serve no purpose other than needless delay. Although Defendant describes the relevant issue on appeal in *Salazar* as whether the plaintiff there could meet the definition of consumer, a more fulsome description of the issue requires a review of the basis upon which the district court dismissed that action: Plaintiff did not qualify as a subscriber where he alleged he "had the same access to the videos on the NBA.com site as any other visitor" and because the

plaintiff had not alleged "the video content [plaintiff] accessed was exclusive to a subscribership."[15]

The Second Circuit's analysis of this issue is largely immaterial in this case where Plaintiff alleges that "status as a subscriber was a condition to accessing additional videos." Compl ¶ 28, *supra*, Section III.B.ii.[16] This critical factual distinction renders a stay improper under the five part test adduced in *Kappel v. Comfort*, which analyzes (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest. 914 F.Supp. 1056, 1058 (S.D.N.Y. 1996). Because the issue raised in *Salazar* (whether the VPPA requires a

---

[15] Although in some instances a stay is appropriate even where issues before the appellate court are not identical, *see Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 622 (S.D.N.Y. 2012) (finding it "would be an inefficient use of time and resources of the court and the parties to proceed in light of a pending U.S. Supreme Court decision, particularly where that decision may not settle every question of fact and law before this Court, but in all likelihood it will settle many and simplify them all.") (cleaned up), there is little expectation that the Second Circuit's decision in *Salazar* will settle or simplify any outstanding issues here.

[16] Defendant's exemplar cases regarding the propriety of the stay are inapposite because they present almost identical issues as those presented in *Salazar*. *Lamb v. Forbes Media LLC*, No. 1:22-CV-06319-ALC, 2024 WL 1364678, at *1 (S.D.N.Y. Apr. 1, 2024) ("This Court ultimately found that Plaintiffs were not subscribers within the meaning of the VPPA because neither Plaintiff alleged that their usage or perusal of Defendant's video offerings was in any way associated with their purported subscription to or account with Forbes."); *Joiner v. NHL Enters, Inc.*, No. 23CV2083LAKBCM, 2024 WL 639422, at *1 (S.D.N.Y. Feb. 15, 2024) (finding stay appropriate in light of similarity of claims with *Salazar* to the extent the claims are based on subscription to a newsletter); *Leslie v. Thompson Reuters Corp.*, No. 22 CIV. 07936 (JHR), 2023 WL 6173511, at *1 (S.D.N.Y. Sept. 22, 2023) ("among the issues on appeal is "[w]hether the District Court erred in finding that Plaintiff would not be able to state a claim under the VPPA because Plaintiff did not meet the definition of 'consumer' as defined by the VPPA.")

connection between the item a user subscribes to and the videos accessed) is not present here (where a connection between the subscription and the videos accessed with the subscription is alleged to exist), none of the five factors weigh in favor of a stay. Plaintiff wishes to proceed, Defendant's burden to engage in litigation will only be delayed – as will the Court's resources, and the public and non-parties suffer not negative impact whatsoever from this case proceeding on its current trajectory.

The issue raised by Defendant here remains unchanged regardless of which party prevails at the Second Circuit. If the plaintiff wins, Mr. Lee's case is somewhat stronger, but if the defendant prevails, the issue is sufficiently distinct that it will have no impact on Mr. Lee's allegations because he expressly alleges a connection between his subscription to Scientific American and his ability to access content he would not otherwise have been able to view.

**D. Any Dismissal Must Be Without Prejudice And With Leave To Amend**

Leave to file an amended complaint should be "freely granted" unless there is a "good reason" for denying it, "such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 101 (2d Cir. 2002); see Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). The Southern District has described the Second Circuit's amendment standard as "very forgiving." *Austin-Spearman*, 98 F. Supp. 3d at 671.

The Court should deny Springer's motion in full for the reasons given above. However, if the Court agrees with Springer that Lee's claims have been insufficiently pleaded in some respect, the Court should dismiss without prejudice and with leave to amend. *Cf. McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir. 1992) ("[T]he lack of a formal motion is not sufficient ground for a district court's dismissal without leave to amend, so long as the plaintiff has made its willingness

to amend clear."). Springer has given no grounds, such as futility or bad faith, for its requested dismissal "with prejudice" and precluding amendment. MTD at 11. To the contrary, Springer's litany of plausibility challenges suggests that, if there is any deficiency in Lee's complaint, such deficiency could be easily cured. Accordingly, if the Court does not wholly deny Springer's motion, it should grant Lee leave to file an amended complaint.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

Dated: September 20, 2024

Respectfully submitted,

*/s/ Samuel R. Jackson*

Samuel R. Jackson (5332325)
James Allen Carney (admitted *pro hac vice*)
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, AR 72202
Telephone: (501) 312-8500
Facsimile: (501) 312-8505
Email: sjackson@cbplaw.com
Email: acarney@cbplaw.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on September 20, 2024, I electronically transmitted the foregoing document with the Clerk of the Court using the CM/ECF system, which will provide electronic mail notice to all counsel of record.

*/s/ Samuel R. Jackson*
Samuel R. Jackson