UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                         :

MARK LEE,                                   :
*On behalf of himself and all others similarly situated,*   :
                                      :           24-cv-4493 (LJL)
                 Plaintiff,      :
                                      :        OPINION AND ORDER
         -v-                   :
                                      :

SPRINGER NATURE AMERICA, INC.      :
                                      :
                 Defendant.    :
                                      X
----------------------------------------------------------------------

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/4/2025___

LEWIS J. LIMAN, United States District Judge:

Defendant Springer Nature America, Inc. ("Springer" or "Defendant") moves, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the complaint against it for lack of standing and failure to state a claim for relief. Dkt. No. 13. Plaintiff Mark Lee ("Plaintiff") moves to strike a declaration offered by Defendant in support of its motion to dismiss. Dkt. No. 20.

For the following reasons, the motion to dismiss is denied.

## BACKGROUND

The Court accepts as true for purposes of this motion the well-pleaded facts of the complaint. The Court also considers "documents incorporated in the complaint by reference[] and matters of which judicial notice may be taken." *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016).

Defendant is a corporation incorporated and headquartered in New York. Dkt. No. 1 ¶ 9. It owns and operates the website https://scientificamerican.com (the "Website"). *Id.* ¶ 9. The Website contains prerecorded videos. *Id.* ¶¶ 28–30. Defendant invites users to become subscribers to its Website by asking them to submit their name, a valid email address, and

payment information. *Id.* ¶ 27. During the relevant time period, users were required to register and become subscribers in order to watch more than three videos on the Website. *Id.* ¶ 28.

The Website contains a pixel (the "Pixel") that transmits to Meta Platforms, Inc. ("Meta"), formerly known as Facebook, information regarding the online activities of persons who access the Website, including the subscriber's Facebook ID ("FID"), the title of the prerecorded audio visual material that the subscriber requests or obtains from the Website, and the Uniform Resource Locator ("URL")[1] to access that material. *Id.* ¶¶ 3–5, 24, 36. Defendant installed the Pixel and selected the specific categories of data it would disclose to Meta. *Id.* ¶ 32. The FID uniquely identifies the subscriber's Facebook profile. *Id.* ¶ 6. From it, Meta can quickly and easily view a particular subscriber's Facebook profile. *Id.* After users' activity is transmitted to Meta by the Pixel, Meta compiles the information to identify personalized "audiences" that consists of individuals who are likely to respond to particular advertisers' messaging, improving the ability of businesses to serve specific subscribers with personalized advertisements and thus the accuracy and effectiveness of the business' advertising campaigns. *Id.* ¶ 21. The Website provides information to Meta and, in exchange, Meta provides advertising capabilities to Defendant. *Id.* ¶ 23.

Plaintiff is an individual who is domiciled in St. Petersburg, Florida. *Id.* ¶ 8. Plaintiff requested or obtained prerecorded audio visual material from the Website using his internet-connected device and web-browsing software installed on that device. *Id.* ¶¶ 8, 44. Plaintiff is a subscriber of Defendant's and has been for over ten years. *Id.* ¶ 42. He alleges that to become a subscriber, he was required to submit his full name and email address to the Website and to

---

[1] A URL, such as www.scientificamerican.com, is also known as a web site address. *See Wolk v. Kodak Imaging Network, Inc*., 840 F. Supp. 2d 724, 747 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v. Photobucket.com, Inc*., 569 F. App'x 51 (2d Cir. 2014).

confirm that email address. *Id.* ¶ 43. He requested or obtained prerecorded audio visual

materials through his subscription to the Website in the two years preceding the filing of this

action. *Id.* ¶ 44. He also alleges that he had a Facebook profile during the entire time he was a

subscriber of Defendant's. *Id.* ¶ 45. He brings this case as a putative class action on behalf of all

persons in the United States who during the time period from June 12, 2022, to the filing of the

complaint, requested or obtained prerecorded audio visual material through a subscription to the

Website operated by Defendant and had a Facebook Profile during the period during which the

Pixel was active on the Website. *Id.* ¶¶ 47–48.

## PROCEDURAL HISTORY

Plaintiff initiated this case by complaint filed on June 12, 2024. *See generally id.* The

complaint alleges that Defendant violated the Video Privacy Protection Act of 1988 ("VPPA"),

18 U.S.C. § 2710, by knowingly disclosing to Meta the FIDs and URLs identifying the

prerecorded audio visual material he and other class members requested or obtained without

obtaining informed written consent. *Id.* ¶¶ 62–64.

On August 23, 2024, Defendant filed this motion to dismiss, Dkt. No. 13, along with a

memorandum of law in support and the declaration of counsel with five exhibits, Dkt. Nos. 14–

16.[2] Defendant also moved in the alternative to stay this case pending the Second Circuit

decision in *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024). Dkt. Nos. 13–14.

On September 20, 2024, Plaintiff filed a memorandum of law in opposition to the motion. Dkt.

No. 19. On October 15, 2024, the Second Circuit rendered a decision in *Salazar*, mooting

Defendant's alternative motion to stay. *Id.* On consent of the parties, the Court extended

Defendant's deadline to file a reply brief and allowed Plaintiff to file a surreply. Dkt. Nos. 21–

---

[2] The declaration of counsel was rejected for a filing error on August 23, 2024, Dkt. No. 15, and was refiled on August 26, 2024, Dkt. No. 16.

22.  On October 23, 2024, Defendant filed a reply memorandum in further support of the motion

to dismiss.  Dkt. No. 25.  On October 30, 2024, Plaintiff filed a surreply memorandum in further

opposition to the motion to dismiss.  Dkt. No. 27.

On September 20, 2024, in conjunction with Plaintiff's memorandum of law opposing the

motion to dismiss, Plaintiff filed a motion to strike the exhibits submitted by Defendant in

support of the motion to dismiss.  Dkt. No. 20.  Defendant filed a memorandum of law in

opposition to the motion to strike on October 23, 2024, Dkt. No. 26, and Plaintiff filed a reply

memorandum in further support of the motion to strike on October 30, 2024, Dkt. No. 28.

## LEGAL STANDARD

A court properly dismisses a claim for lack of subject matter jurisdiction under

Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St.*

*Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015).  To survive

a 12(b)(1) motion to dismiss for lack of standing, a plaintiff "must allege facts that affirmatively

and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671

F.3d 140, 145 (2d Cir. 2011).  "A plaintiff asserting subject matter jurisdiction has the burden of

proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d

110, 113 (2d Cir. 2000).  "A motion to dismiss for lack of subject matter jurisdiction may 'raise a

facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence.'"

*U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283, 296 (E.D.N.Y.

2012) (quoting *Guadagno v. Wallack Ader Levithan Assocs.*, 932 F. Supp. 94, 95 (S.D.N.Y.

1996)).  Where the defendant challenges the legal sufficiency of a complaint's allegations, the

court must treat all factual allegations as true and draw reasonable inferences in favor of the

complaining party. *Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001).

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Defendant argues that the complaint should be dismissed because Plaintiff has failed to allege facts that support his standing. Dkt No. 14 at 7–11. Defendant also argues that the complaint fails to state a claim for relief under the VPPA because (i) Defendant is not a video tape service provider, *id.* at 12–13; (ii) Plaintiff is not a "consumer" under the VPPA, *id.* at 13–17; (iii) Plaintiff's FID and accessed URLs do not constitute personally identifiable information ("PII") under the VPPA, *id.* at 18–20; and (iv) the complaint fails to allege that Defendant "knowingly" disclosed Plaintiff's PII, *id.* at 20–22.

Defendant relies in part on a declaration of counsel and certain exhibits.  Dkt. No. 16.

Plaintiff argues that these documents may not be considered on a motion to dismiss.  Dkt.

No. 20.  The Court turns first to this threshold issue.

## I.    Documents Considered on the Motion to Dismiss

Defendant submits five exhibits with its motion to dismiss: (1) a copy of a webpage from

the Website titled "About Scientific American," which states that Scientific American was

founded in 1845 and has published articles by more than 200 Noble Prize winners; (2) a copy of

the landing page for the Website allegedly from June 11, 2022, accessed from the Wayback

Machine[3]; (3) a copy of the current landing page from the Website; (4) a copy of the video page

from the Website allegedly from June 11, 2022, accessed through the Wayback Machine; and

(5) a copy of the video page from the Scientific American website as it currently appears.  Dkt.

No. 16.

Defendant also submits a declaration of counsel which, in addition to describing the

attached exhibits, makes the following assertions: (1) "[i]n June 2022, all videos were freely and

publicly available on the video page and there was no restriction on the numbers of videos that

could be viewed on the page," *id.* ¶ 3; (2) "in June 2022, this video page could be accessed by

navigating to and clicking a button at the top of the https://www.scientificamerican.com landing

page without signing in to the website," *id.* ¶ 4; (3) "[a]ll videos on the website are freely and

publicly available on the video page and there was no restriction on the numbers of videos that

can be viewed on the page," *id.* ¶ 5; and (4) "the video page can currently be accessed by

---

[3] "The Wayback Machine is an online digital archive of web pages— 'a digital library of Internet sites'—run by the Internet Archive, a nonprofit library in San Francisco."  *Thorne v. Square, Inc.*, 2022 WL 542383, at *1 n.2 (E.D.N.Y. Feb. 23, 2022) (quoting *Mojave Desert Holdings, LLC v. Crocs, Inc.*, 844 F. App'x 343, 346 n.2 (Fed. Cir. 2021)); *see* The Internet Archive, *About the Internet Archive*, https://archive.org/about (last visited March 3, 2025).

navigating to the "Explore Topics" button on the landing page, clicking it, and selecting Videos without signing into the website." *Id.* ¶ 6.

Plaintiff argues that none of the exhibits are the proper subject of judicial notice, and none have been incorporated by reference or are otherwise judicially cognizable on this motion to dismiss. Dkt. No. 20.[4]  Defendant argues that the Court can take judicial notice of Exhibits B and C because they are the landing pages through which Plaintiff purportedly signed up for his subscription and Exhibits D and E because they are primary access points for Defendant's videos from which the Pixel purportedly collected viewer data. Dkt. No. 26 at 9–10.  Defendant argues that the website is incorporated by reference and the Court may consider it as it existed during the relevant time period in resolving its motion to dismiss. *See Orozco v. Fresh Direct, LLC*, 2016 WL 5416510, at *5 (S.D.N.Y. Sept. 27, 2016).

For a document to be incorporated into the complaint by reference, "the complaint must make a clear, definite and substantial reference to the document." *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 436 (S.D.N.Y. 2022) (quoting *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019)).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Guzman v. Bldg. Serv. 32BJ Pension Fund*, 2023 WL 2526093, at *6 (S.D.N.Y. Mar. 15, 2023)

---

[4] Plaintiff frames his argument as a motion to strike pursuant to Federal Rule of Civil Procedure 12(f).  However "Rule 12(f) does not authorize this court to strike documents other than pleadings." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 238 (S.D.N.Y. 2023) (quoting *Honig v. Hansen*, 2021 WL 4651475, at *3 (S.D.N.Y. Oct. 6, 2021)).  Accordingly, to the extent Plaintiff seeks relief in the form of striking the exhibits from the docket, that request is denied.

(quoting *Chambers*, 282 F.3d at 153) (internal quotation marks omitted).  "Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough."  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)).  The contents of the document must "appear to have been necessary to the 'short and plain statement of the claim showing that [a plaintiff is] entitled to relief.'"  *Lateral Recovery*, 632 F. Supp. 3d at 436 (quoting *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008)).  In addition, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Federal Rule of Evidence 201 allows the Court to take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.  "Courts have . . . taken judicial notice of materials in the public record, such as federal copyright registrations, newspaper articles, and regulatory filings."  *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020).  In addition, "the case law applying Rule 201 states that, '[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'"  *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (quoting *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006)); *see Fernandez v. Zoni Language Centers, Inc.*, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) ("Courts may also take judicial notice of information contained on websites where 'the authenticity of the site has not been questioned.'"

(quoting *Hotel Emps. & Rest. Emps. Union, Loc. 100 of N.Y., N.Y. & Vicinity, AFL CIO v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002))), *aff'd*, 858 F.3d 45 (2d Cir. 2017).

However, "[i]f the court takes judicial notice, it does so in order 'to determine *what* statements [the documents] contained'—but '[] *not for the truth of the matters asserted.*'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *see Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents."); *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436 (S.D.N.Y. 2014) ("[I]t is inappropriate to discredit the factual allegations of a complaint merely because they are contradicted by assertions made in judicially noticeable documents.").  Defendants may rely on judicially noticed documents to show that something was stated or that someone was put on notice, but "cannot rely on them to 'prove the truth of their contents.'" *Hesse*, 463 F. Supp. 3d at 462 (quoting *Roth*, 489 F.3d at 509); *see also Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012) (summary order) (affirming the district court's decision to take judicial notice of documents, including a webpage, "for the purpose of establishing that the information was publicly available," and not for their truth).  This rule makes sense.  Although the fact that a website contains certain text "cannot reasonably be questioned," Fed. R. Evid. 201, assertions made on a website do not enjoy the same privilege and frequently may be disputed.  *See Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), *as amended* (Nov. 20, 2007) ("[P]rivate corporate websites, particularly when describing their own business, generally are not the sorts of 'sources whose accuracy cannot reasonably be questioned,'" (quoting Fed. R. Evid. 201)).  Facts stated on

9

a website are not inherently more accurate than facts stated elsewhere.  A defendant may not short-circuit the summary judgment process by introducing disputable facts on a Rule 12(b)(6) motion, simply because they are stated on a website.  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc*., 146 F.3d 66, 70 (2d Cir. 1998) ("Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b).").  "A contrary rule would permit the improper transformation of the Rule 12(b)(6) inquiry into a summary-judgment proceeding—one featuring a bespoke factual record, tailor-made to suit the needs of defendants."  *Goel*, 820 F.3d at 560.  "Such undermining of the usual pleading burdens is not the purpose of judicial notice."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

Here, the Court cannot rely on the factual averments of counsel in support of the motion. *See HB v. Monroe Woodbury Cent. Sch. Dist*., 2012 WL 4477552, at *5 (S.D.N.Y. Sept. 27, 2012) ("[I]t is generally improper to consider factual averments . . . contained in an attorney affidavit on a 12(b)(6) motion.") (collecting cases); *Clark v. Kitt*, 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014), *aff'd*, 619 F. App'x 34 (2d Cir. 2015).  These statements are not incorporated by reference in the complaint, nor are they matters of which judicial notice can be taken.  They simply present Defendants "own factual allegations not alleged in the complaint," which "cannot be considered by the Court at this stage of the litigation."  *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 298 (E.D.N.Y. 2014).  Counsel declares, for example, that "[i]n June 2022 . . . there was no restriction on the numbers of videos that could be viewed on the page," Dkt. No. 16 ¶ 3, directly contradicting Plaintiff's allegations that "users were required to register and become subscribers in order to watch more than three videos on the Website," Dkt. No. 1

10

¶ 28.  Counsel's assertion may be the subject of discovery, but it cannot be considered on this motion to dismiss.

Defendant suggests that the facts asserted by counsel are supported by the exhibits, which are properly cognizable.  Dkt. No. 26 at 6–7.  The exhibits could provide a basis for the Court to consider the facts, but such basis is entirely independent of the declaration of counsel.  The Court may consider a fact on a motion to dismiss if it is stated in the complaint, "documents incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Concord Assocs.*, 817 F.3d at 51 n.2.  But the Court may not consider a fact simply because counsel states it is true.  Therefore, the Court turns to whether any of the exhibits provided by Defendant are properly cognizable and relevant here.

The exhibits consist of various webpages.  Dkt. Nos. 16-1–16-4.  Authority in this Circuit supports that the Court may take judicial notice of the content of webpages, including the content of archived webpages available through the Wayback Machine.  *See Wells Fargo Bank*, 127 F. Supp. 3d at 167; *Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 408 (S.D.N.Y. 2022); *Thorne v. Square, Inc.*, 2022 WL 542383, at *1 (E.D.N.Y. Feb. 23, 2022) (collecting cases taking judicial notice of pages from the Wayback Machine).  "[T]he contents of web pages available through the Wayback Machine [are] facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned under Federal Rule of Evidence 201." *Distributorsoutlet.com, LLC v. Glasstree, Inc.*, 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016).  Plaintiff has given the Court no reason to depart from that judicial consensus.  However, the webpages themselves, setting aside the "facts" declared by counsel, are of limited relevance to the consideration of this motion.

Exhibit A, the webpage titled "About Scientific American," is offered for the truth of the statements contained within, namely that Defendant has been a global publisher of scientific magazines for almost two centuries and that the website features articles that are published in its print magazine as well as online. Dkt. No. 14 at 1. The Court cannot take judicial notice of this statement for its truth. *See Victaulic Co.*, 499 F.3d at 236; *Roth*, 489 F.3d at 509. Because Defendant does not offer it for any other purpose, the exhibit is not cognizable.

Exhibits B and D show the landing page and video page for the Website on June 11, 2022, at the start of the class period. The Court takes judicial notice that on June 11, 2022, the landing page contained a button labeled "subscribe," in the top left and a button labeled "video" in the horizontal menu bar underneath the title. *See* Dkt. No. 16-2. The Court also takes judicial notice that the video page contained the same "subscribe" button and menu bar, and beneath that, a four-by-four grid of sixteen video thumbnails and their titles. Dkt. No. 16-4. The fact that the web pages contain that information cannot reasonably be questioned. *See Distributorsoutlet.com*, 2016 WL 3248310, at *2.

The Court will not take judicial notice of the fact that "users of the Website . . . in 2022 (the beginning of the class period) could navigate to the Video Page and view videos on the Website without limitation." Dkt. No. 26 at 6. Although the content of the web pages cannot reasonably be questioned, the functionality of those pages and the ability of a user to navigate them cannot "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Defendant suggests that the Court may "visit the website and the hyperlinks" within the Wayback Machine, view more than three videos, and thus determine that the website did not limit access. Dkt. No. 26 at 6–7. Defendant's suggestion is a bridge too far. Courts have accepted that the Wayback Machine accurately represents what

webpages stated at earlier points in time.  For example, Courts have noticed the contents of a

Wayback Machine page to determine when information was first made available to the public or

to determine the terms of usage stated on a website at a particular point in time.  *See Valve Corp.*

*v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1374 (Fed. Cir. 2021); *Distributorsoutlet.com*, 2016

WL 3248310, at *1–2.  Such purposes require only that the Wayback Machine version of the

webpage adequately reflect its text.  However, Defendant has cited no case in which a court has

accepted the Wayback Machine, not for the accuracy of its depiction of a web page as it existed

at a particular historical time in the past, but for the ways in which that page could have been

used at that distant time.  It is not at all clear that the Wayback Machine accurately reflects the

complex functionality of a webpage at an earlier time, as opposed to simply the content it

contained.  The inference that it does so can "reasonably be questioned."  Fed. R. Evid. 201.  It is

not a proper subject for judicial notice.

Exhibits C and E show the landing page and video page for the Website on August 14,

2024.  The Court may take judicial notice of these pages and also of the current version of the

Website, which is publicly available.  *See Carter v. Scripps Networks, LLC*, 670 F. Supp. 3d 90,

98 (S.D.N.Y. 2023); *Williams v. PMA Cos., Inc.*, 419 F. Supp. 3d 471, 484 (N.D.N.Y. 2019).

However, these documents are not material to the claims Plaintiff brings in the complaint,

because they are outside of the class period.  The class period was from June 11, 2022, to June

12, 2024.  Dkt. No. 1.  Drawing all inferences favorable to the Plaintiff, the Court may not

assume that the functionality of the website at the time of this motion or in August of 2024

reflects its functionality during the class period.[5]

---

[5] Plaintiff represents in his reply brief that "in March of 2024 the Website ceased its practice of
requiring a subscription to access more than three videos."  Dkt. No. 28 at 3.  Whether the

## II.    Standing

Defendant argues that Plaintiff lacks Article III standing.  Dkt. No. 14 at 7–11; Dkt. No. 25 at 1 n.1.  That issue is resolved by the Second Circuit's decision in *Salazar v. National Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024).

The plaintiff in *Salazar* was a subscriber to an online email newsletter offered by defendant, the National Basketball Association ("NBA"), where he watched videos.  *Id.* at 536.  He alleged that the NBA violated his rights under the VPPA by disclosing his video-watching history to Meta without his permission.  *Id.*  The NBA argued that plaintiff failed to allege a concrete injury in fact and therefore lacked Article III standing because the NBA made only a limited disclosure to a single legitimate business.  *Id.* at 542–43.  The Second Circuit had little trouble rejecting that argument and finding that the plaintiff alleged standing.  The harm alleged by the plaintiff bore a relationship to the well-established common law claim of public disclosure of private facts.  *Id.* at 541–42, 544.  Plaintiff did not allege simply "that his personal viewing information was disclosed to an intermediary so that it could be bounced back to him on behalf of the entity that properly possessed the information."  *Id.* at 543.  Plaintiff's personally identifiable information was exposed to an unauthorized third party which then used that information for its own commercial purposes.  *Id.* at 542, 543.

Plaintiff's allegations mirror those found sufficient in *Salazar*.  He alleges that he was a subscriber to Defendant's webpage and that he requested or obtained prerecorded audio visual materials through his subscription to the Website.  Dkt. No. 1 ¶¶ 42, 44.  He also alleges that to become a subscriber, he submitted his full name and email address to Defendant.  *Id.* ¶ 43.  He further alleges that he has had a Facebook profile during the entire time he has been a subscriber

Defendant stopped requiring a subscription to access videos on the Website during the class period, if it did so, is an issue properly resolved on a more developed evidentiary record.

of Defendant's and that Defendant disclosed to Meta his FID coupled with the title of the

prerecorded audio visual material he requested or obtained and the URLs to access that material.

*Id.* ¶ 45.  Finally, Plaintiff alleges that Meta used Plaintiff's personally identifiable information,

without his authorization, for its own commercial benefit.  *Id.* ¶¶ 21–23.  The use of that

information contributed to the billions of dollars of advertising revenue earned by Meta.  *Id.* ¶

23.[6]

Plaintiff has alleged standing.

## III.    VPPA Liability

"The VPPA prohibits a 'video tape service provider' from 'knowingly disclos[ing], to

any person, personally identifiable information concerning any consumer of such provider,'

subject to certain enumerated exceptions, such as in cases where the provider has obtained a

consumer's 'informed, written consent.'"  *Salazar*, 118 F.4th at 545 (quoting 18 U.S.C.

§ 2710(b)).[7]  "To state a claim under § 2710(b), a plaintiff must allege that (1) a defendant is a

'video tape service provider,' (2) the defendant disclosed 'personally identifiable information

---

[6] Defendant attempts to avoid *Salazar*'s holding by arguing that although a VPPA claim resembles the common-law tort of public disclosure of private facts "when alleged with sufficient specificity," Plaintiff's claims lacks the necessary "particularity."  Dkt. No. 25 at 1 n.1 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)).  But Plaintiff has alleged that "his personally identifiable information was exposed to an unauthorized third party," an injury analogous to the common-law tort.  *Salazar*, 118 F.4th at 542.  He specifically alleges that his personal viewing information was disclosed to Meta by Defendant and the manner in which this occurred.  Dkt. No. 1 ¶¶ 1, 6.  There is no deficit in the pleading that makes the harm here unlike the common-law tort or the violation addressed in *Salazar*.

[7] Consent to the disclosure of personally identifiable information must be provided "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer."  18 U.S.C. § 2710(b)(2)(B)(i).  It may be given "at the time the disclosure is sought" or "in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner."  *Id.* § (b)(2)(B).  The provider must also provide an opportunity "in a clear and conspicuous manner, for the consumer to withdraw on a case-by- case basis or to withdraw from ongoing disclosures."  *Id.* § (b)(2)(B)(iii).  Defendant makes no argument at this stage that Plaintiff provided consent to the disclosure of his personally identifiable information.

concerning any consumer' to 'any person,' (3) the disclosure was made knowingly, and (4) the

disclosure was not authorized by another part of the statute." *Martin v. Meredith Corp.*, 2023

WL 2118074, at *3 (S.D.N.Y. Feb. 17, 2023) (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062,

1066 (9th Cir. 2015)).

Defendant argues that the complaint fails to state a claim for relief under the VPPA

because (i) Defendant is not a video tape service provider, Dkt. No. 14 at 12–13; (ii) Plaintiff is

not a "consumer" under the VPPA, *id.* at 13–17; (iii) Plaintiff's FID and accessed URLs do not

constitute PII under the VPPA, *id.* at 18–20; and (iv) the complaint fails to allege that Defendant

"knowingly" disclosed Plaintiff's PII, *id.* at 20–22.

### A.   Video Tape Service Provider

A video tape service provider is defined in pertinent part as "any person, engaged in the

business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded

video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710.

"The definition of 'video tape service provider' is broad, encompassing '*any* person[ ]

*engaged in the business* . . . of rental, sale, or delivery of prerecorded video cassette tapes or

similar audio visual materials.'"  *Salazar*, 118 F.4th at 548 (quoting 18 U.S.C. § 2710(a)(4)).

"That definition is not limited to entities that deal exclusively in audiovisual content; rather,

audiovisual content need only be *part* of the provider's book of business."  *Id.*   Moreover, the

definition is worded in the disjunctive.  It is sufficient that the defendant, is engaged in the

business of the "rental" of audio visual materials, the "sale" of such materials, or the "delivery"

of such materials.  *See In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D.

Cal. 2017).  Finally, "Congress's use of the phrase 'similar audiovisual materials' indicates that

the definition is medium-neutral; the defendant must be in the business of delivering video

content, but that content need not be in a particular format."  *Vizio*, 238 F. Supp. 3d at 1221; *see*

*Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 718 (N.D. Cal. 2023); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012).

The term "video tape service provider" does not include every business with some tangential relationship to video content.  Courts have held that "for the defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose."  *Vizio*, 238 F. Supp. 3d at 1221; *see also Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023); *Ghanaat*, 689 F. Supp. 3d at 718; *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *3 (N.D. Cal. July 20, 2023).  Both parts of that test must be satisfied.  A developer of a product that is only "peripherally or passively involved in video content delivery," such as a television remote, would not be "substantially involved in the conveyance of video content to consumers" and thus would not fall within the statutory definition of a video service provider.  *Vizio*, 238 F. Supp. 3d at 1221–22.  In addition, the defendant's business must also in some way be "tailored" to the delivery of video content.  "[A] letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox" is substantially involved in the conveyance of the videotape, but she is not "'engaged in the business' of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package."  *Id.*

Taking the allegations of the complaint as true, Plaintiff has alleged that Defendant is a videotape service provider.  Plaintiff alleges that Defendant offered videos on its Website.  Dkt. No. 1 ¶ 28.  Plaintiff also alleges that Defendant conditioned access to more than three videotapes on its Website on a user registering and becoming a subscriber.  *Id.*  The complaint further alleges that access to the videos enhanced the user's viewing experience.  *Id.*  Defendant

allowed users to "view on-demand, pre-recorded audio-visual materials through its website" as part of its business model. *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156 (S.D.N.Y. 2023). "[I]t is reasonable to think that developing a website to deliver video content requires more significant 'tailor[ing] to serve that purpose' than a package delivery service shipping videocassettes along with other physical goods." *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 852 (N.D. Cal. 2022) (quoting *Vizio*, 238 F. Supp. 3d at 1221); *see also Jackson*, 2023 WL 4670285, at *3.

Defendant argues that the complaint is defective because it does not allege that Defendant's business is "centered, tailored, or focused around providing and delivering audiovisual content." Dkt. No. 14 (quoting *Cantu v. Tapestry, Inc.*, 697 F. Supp.3d 989, 994 (S.D. Cal. 2023)). It asserts that its primary business is as "a publisher of print magazines and articles focused on developments in scientific fields," and that the minimal videos hosted on its Website do not turn it into a video tape services provider. *Id.* at 12–13.

Defendant's argument asks the Court to consider the contents of Exhibit A for their truth. However, as explained *supra*, the statements on the webpage cannot be taken for their truth at this stage of the litigation. Moreover, Defendant misstates the applicable standard. The definition of videotape service provider "is not limited to entities that deal *exclusively* in audiovisual content; rather, audiovisual content need only be *part* of the provider's book of business." *Salazar*, 118 F. 4th at 548. "[B]y its plain terms, the statute applies equally to a business dealing primarily in audiovisual materials (think Blockbuster) and one dealing in primarily *non*-audiovisual materials (think a general store that rents out a few movies)." *Id.*; *see also id.* at 549 (Congress defined video tape servicer provider "broadly to include even those businesses that dabble in video rentals."); *Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 314

(D. Mass. 2022) ("[T]he VPPA is not limited to entities that are primarily engaged in the business of providing video content.").  Nor is it required that Defendant charge separately for access to the videotapes.  *See Ghanaat*, 689 F. Supp. 3d at 718; *Jackson*, 2023 WL 4670285 at *3.  "[I]t is plausible to conclude from [Plaintiff's allegations] that [Defendant] engages in the business of delivering audio visual materials, and that its business is significantly tailored to serve that purpose."  *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (internal citations and quotations omitted).

### B.    Consumer

The VPPA defines the term "consumer" to mean "*any* renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1) (emphasis added).

Relying on the district court decision in *Salazar v. National Basketball Ass'n*, 685 F. Supp. 3d 232 (S.D.N.Y. 2023), Defendant first argues that to be a consumer under the VPPA "a person must rent, purchase, or subscribe to audiovisual materials," or, in other words, there must be a connection "between the subscription and the video content."  Dkt. No. 14 at 13–14, 16. Defendant argues that the definition does not reach one who buys a subscription to a newsletter or website and then, having purchased such subscription, accesses a videotape for free.  *Id.* at 15. On reply, Defendant makes the additional argument that Plaintiff has not pleaded he is a subscriber because he did not provide a significant amount of personal information to form a subscriber relationship.  Dkt. No. 25 at 3–7.

Defendant's first argument is foreclosed by the Second Circuit's decision in *Salazar*.  The court reversed the district court decision upon which Defendant relies.  In *Salazar*, the court held that the term "'any' has expansive meaning."  *Salazar*, 118 F.4th at 546 (quoting *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008)).  The term "goods or services" in the definition of "consumer" is not limited to audiovisual services but applies to a "good or service generally."

*Salazar*, 118 F.4th at 546.  It further held that a person alleges she is a "subscriber" by pleading that she provided consideration in the form of personal information in exchange for the good or service.  *Id.* at 552.  Thus, under *Salazar*, a plaintiff need not plead that they paid separate consideration for access to the audio visual material.  It is sufficient that Plaintiff subscribed to the Website, which is a good or service provided by Defendant, and that Defendant is a video tape service provider.

Defendant's second argument is no more persuasive.  In *Salazar*, the Circuit adopted the distinctions previously made by the First and Eleventh Circuits in addressing who is a VPPA subscriber.  A person becomes a VPPA subscriber by providing consideration in the form of personal information in exchange for a good or service.  118 F.4th at 552–53.  Even if the subscriber does not pay for increased content in money, the subscriber pays "in form of . . . information, which [is] of value" to recipients in the digital economy.  *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016); *see Salazar*, 118 F.4th at 533.  In that way, the plaintiff establishes a relationship with the website different from what would be the case if the website is "one of millions of sites" that the plaintiff might access through a web browser.  *Id.* at 551 (quoting *Yershov*, 820 F.3d at 489).

Plaintiff's allegations satisfy the *Salazar* test.  Plaintiff alleges that Defendant invites users to become subscribers to its Website by asking them to submit their name, a valid email address, and payment information.  Dkt. No. 1 ¶ 27.  He further alleges that, during the class period, users were required to become subscribers in order to watch more than three videos on the Website.  *Id.* ¶ 28.  Finally, he alleges that he is a subscriber of Defendant and became a subscriber by submitting his full name and email address to Defendant, and then confirming that email address.  *Id.* ¶¶ 8, 42–43.  By so doing, he conveyed valuable personal information to

Defendant and established a relationship permitting Defendant to be in touch with him regarding the Website.  At the pleading stage, that is enough to make him a VPPA subscriber.

### C.    Personally Identifiable Information

Next, Defendant argues that Plaintiff has not alleged that Defendant disclosed his personally identifiable information ("PII").  Plaintiff alleges that Defendant discloses to Meta a "URL containing the name of the audio visual material requested" and an "FID," Dkt. No. 1 ¶ 30, and that with that information, Meta can enter the FID into https://www.facebook.com and "identify the specific speaker," *id.* ¶ 38.   However, Defendant argues that Plaintiff fails to allege that his FID, even inserted into the hyperlink, would show a Facebook account that contains his name, pictures, or other similarly identifying information.  Dkt. No. 14 at 19.

"When interpreting a statutory provision, we start with the text."  Salazar, 118 F.4th at 546.  The VPPA defines "personally identifiable information" by stating that it "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  The term "personally identifiable information" means information that can be used to identify the person, as "the suffix 'able' means 'capable of.'"  *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 (9th Cir. 2017); *see Wilson v. Triller, Inc*., 598 F. Supp. 3d 82, 90–91 (S.D.N.Y. 2022).  The term is commonly used in government publications and data privacy literature, and it had already been used in several statutes before the passage of the VPPA.  *See* U.S. Dep't of Labor, *Guidance on the Protection of Personally Identifiable Information,* https://www.dol.gov/general/ppii (last accessed March 3, 2025) (defining PII as "[i]nformation that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual"); Nat'l Inst. of Standards & Tech., *Guide to Protecting the Confidentiality of Personally Identifiable Information (PII)* § 2-1 (2010) ("One of the most

widely used terms to describe personal information is PII," and providing examples); Joshua J.
McIntyre, *Balancing Expectations of Online Privacy: Why Internet Protocol (IP) Addresses
Should Be Protected As Personally Identifiable Information*, 60 DePaul L. Rev. 895, 902–05
(2011) (surveying definitions of PII); Cable Communications Policy Act of 1984, 47 U.S.C.
§ 551(a)(2)(A); Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C.
§ 1232g(b)(3); *see also* Privacy Act of 1974, 5 U.S.C. § 552a (discussing "identifiable" or
"individually identifiable information").  Though definitions of PII vary, information such as a
name, address, phone number, or social security number is generally considered PII.  *See Warner
v. Am. Cablevision of Kan. City, Inc.*, 699 F. Supp. 851 (D. Kan. 1988) ("It would be hard to
conceive of information which more personally identifies an individual than his name, address,
and telephone number."); *McMorris v. Carlos Lopez & Assocs.*, LLC, 995 F.3d 295, 298 (2d Cir.
2021) (describing "Social Security numbers, home addresses, dates of birth, [and] telephone
numbers" as "personally identifiable information"); 34 C.F.R. § 99.3 (defining PII under FERPA
to include a student's name, address, social security number, biometric records, and date of
birth).  These types of information are closely associated with a unique individual and can be
used to trace the individual or otherwise intrude on her privacy.

In the context of "personally identifiable information," "identifiable" does not necessarily
mean "identifiable by name."  *See In re Hulu Priv. Litig.*, 2014 WL 1724344, at *7 (N.D. Cal.
Apr. 28, 2014) (noting that the VPPA "does not say "identify by name" and thus plainly
encompasses other means of identifying a person").  A social security number most directly
identifies a unique person, but it does not reveal their name.  Indeed, a name by itself may not
reveal much.  In a population as large as the United States, numerous people share the same
names.  *See* Andrew Flowers, *More Evidence James Smith Is The Most Common Name In The*

*U.S.*, FiveThirtyEight (November 24, 2014) https://fivethirtyeight.com/features/more-evidence-james-smith-is-the-most-common-name-in-the-u-s (noting that in 2014, there were more than 31,000 James Smiths in the United States).  The recipient of a name will often require more information to identify the person to whom the name is attached.   A combination of characteristics, such as an address and a physical description, may be as or more descriptive of an individual than a name. *See Hulu*, 2014 WL 1724344, at *11 ("One can be identified in many ways: by a picture, by pointing, by an employee number, by the station or office or cubicle where one works, by telling someone what 'that person' rented.").  Thus, PII need not be information which leads to an individual's name.

The VPPA states that "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  "[T]he word 'includes,' when used in a statute, 'is usually a term of enlargement, and not of limitation.'" *Pfizer, Inc v. U.S. Dep't of Health & Hum. Servs.*, 42 F.4th 67, 76 (2d Cir. 2022) (quoting *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008)).  The language establishes that under the VPPA, the meaning of PII must be understood to encompass information related to video materials.  But it does not limit PII to information which "identifies an individual as having watched certain videos." *Eichenberger*, 876 F.3d at 984.  That is only one example of the category of personally identifiable information, which, consistent with the established usage of the term, refers more broadly to "information that can be used to identify an individual." *Id.*; *see Wilson*, 598 F. Supp. 3d at 90–91.

Some courts have stated that for information to be PII it must "actually disclose" the individual consumer, and not just provide information that discloses the individual when

combined with "other pieces of information collected elsewhere." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 182 (S.D.N.Y. 2015); *see Hulu*, 2014 WL 1724344, at *11; *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 283 (3d Cir. 2016). This does not accord with the natural reading of PII as information that "can be used" to identify an individual, and statutory context confirms that it cannot be correct. Section 2710(b)(2) of the statute identifies names and addresses as PII protected by the VPPA. *See* 18 U.S.C. § 2710(b)(2)(D).[8] Few pieces of information uniquely disclose an individual—perhaps only a social security number or biometric information. But PII is not limited only to social security numbers and biometric information. A name is PII because it permits the identification of an individual when combined with other information. But the point is even more clear in the case of an address. An address does not tell you who lives at that address. A person in possession of a list of videos with addresses would need to visit the location, consult records, or conduct interviews in order to discover who occupies that address. But with an address, a recipient who is resourceful enough can identify an individual. Thus, PII must be read to include not only information that directly identifies the renter of a video, but also at least some information "that *can be used* to identify an

---

[8] Section 2710(b)(2) is one of several statutory exceptions permitting the disclosure of personally identifiable information. It states that the "video tape service provider may disclose personally identifiable information concerning any consumer . . . to any person is the disclosure is solely of the names and addresses of consumers and if – (i) the video tape service provider has provided the consumer with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure; and (ii) the disclosure does not identify the title, description, or subject matter of any video tapes or other audio visual material . . . ." 18 U.S.C. § 2710(b)(2). This exception implies that if the disclosure of names and addresses does not fit within the circumstances set forth in Section 2710(b)(2)(D), it would run afoul of the VPPA proscription against the disclosure of personally identifiable information. *See Robinson v. Disney Online*, 152 F. Supp. 3d 176, 182 (S.D.N.Y. 2015) ("[N]ames and addresses are expressly included within the definition of PII, as is clear from the face of the VPPA").

individual" when combined with other information.  *Eichenberger*, 876 F.3d at 984; *see Wilson*, 598 F. Supp. 3d. at 90–91.

The term PII as used in the VPPA therefore covers, at minimum, 1) names, 2) addresses, and 3) information with analogous ability to identify an individual who has "requested or obtained specific video materials."  18 U.S.C. § 2710(a)(3).[9]  The first two are stated explicitly in the statute, while the last recognizes that the inclusion of names and addresses as PII is stated not to be exclusive and is required in order to read the general definition of "personally identifiable information" consistently with the inclusion of names and addresses.  A definition based on a piece of information's ability to identify a person cannot be consistently read to include names and addresses but exclude other pieces of information with the same or greater ability to identify a person.

It is further clear from the text of the statute as a whole that "personally identifiable information" refers to categories of information, *i.e.*, names, addresses, or other forms of information, regardless of the precise content of that information, *e.g.*, whether the name is

---

[9] The definition of "personally identifiable information" and the context of the statute suggest that it only prevents disclosure of PII which would connect an individual to video materials.  *See Salazar*, 118 F.4th at 548 (reading the definition of PII to contain a "restriction" to "information about 'video materials or services'").  On the other hand, Section 2710(a)(2)(D) seems to imply that disclosure of PII may be prohibited even if does not connect the consumer to specific video material.  That Section states that a disclosure "solely of the names and addresses of consumers" is permitted if "the disclosure does not identify the title description, or subject matter of any video tapes or other audio visual material" *and* "the video tape service provider has provided the consumer with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure."  18 U.S.C. § 2710(a)(2)(D).  Thus, if a provider disclosed a list solely of names and addresses of customers, with no information about video material they obtained, this would still seem to be prohibited unless the provider gave the consumer "the opportunity, in a clear and conspicuous manner, to prohibit such disclosure."  18 U.S.C. § 2710(a)(2)(D).  The Court need not decide here whether a disclosure must connect an individual to video information to be prohibited by the VPPA, as Plaintiff clearly alleges that the Defendant's disclosure connected his Facebook ID to his video information.

common or distinctive, or the recipient of a particular disclosure.  The VPPA is directed towards video service providers and commands them "not to do certain things with consumer information." *Eichenberger*, 876 F.3d at 985.  The definition of PII thus must be read, at least in part, from the perspective of the video service provider.  *Id.*  From that perspective, the definition of PII must be categorical.  The video service provider will know it has a name, a telephone number or an address, but it will not know and cannot know how readily that specific information can be linked to a unique individual.  The address may be that of an individual's permanent home, a temporary stay, a family member's house, or a false address.  The same is true of any other type of information.  Congress did not intend for there to be a trial on the merits in each case regarding how distinctive a name is or how recognizable a person is from her picture.  It intended to prevent video providers from disclosing names, addresses, and other types of information that are similarly capable of identifying an individual.  The meaning of PII does not turn on the substance, as opposed to category, of a particular disclosure.

Additionally, as Judge Rakoff has observed, the meaning of PII cannot depend on the recipient of a particular disclosure.  *Wilson*, 598 F.Supp.3d at 91–92; *accord Robinson*, 152 F. Supp. 3d at 181–82; *Eichenberger*, 876 F.3d at 985.  Aside from prohibiting disclosures, the VPPA requires that providers destroy PII after a certain time period.  *See* 18 U.S.C. § 2710(e).  This command would be impossible to follow if the definition of PII depended on the recipient of a disclosure.  The requirement applies and is most salient even if the information never is disclosed.  *See Wilson*, 598 F.Supp.3d at 91–92 ("It would make little sense for the scope of PII to be recipient-dependent where the conduct at issue does not involve disclosure to a third-party.").

Finally, there is no evidence whatsoever that Congress intended the types of personally identifiable information covered by the statute to be frozen in time.  The VPPA was passed in 1988 in response to an article published in the Washington City Paper "which identified 146 films that Judge Robert Bork and his family had rented from a video store."  *Salazar*, 118 F.4th at 544.  It did not incorporate "a contemporary understanding of Internet privacy."  *In re Nickelodeon*, 827 F.3d at 290.  But it does not follow that the types of information that a renter of video tapes provided to a video tape service provider in 1988 are the only types of personally identifiable information providers are prohibited from disclosing today.  In adopting the 2012 amendment to the VPPA, "Congress recognized that 'the Internet ha[d] revolutionized the way that American consumers rent and watch television programs,' such that the way 'American used to watch videos in 1998—the VHS cassette tape—[wa]s now obsolete.'"  *Salazar*, 118 F.4th at 545 (quoting S. Rep. 112-258, at 2).  That observation did not consign the VPPA to a fate of desuetude.  Congress accepted that the VPPA prevented companies from sharing individuals' "video preferences on social media sites," and that the statute, as originally adopted, would require consent for each disclosure of viewing information, passing amendments only to permit consent on an ongoing basis and through the internet.  *See Salazar*, 118 F.4th at 545; 18 U.S.C. § 2710(b)(2)(B); S. Rep. 112-258, at 2–3; *see* Video Privacy Protection Act Amendments Act of 2012, Pub. L. 112-258, 126 Stat. 2414.  That amendment would make no sense if Congress did not also intend the VPPA to reach technologies that did not exist in 1988 and information that is disclosed in the use of those technologies.

The purposes of the Act, "to preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials," and to ensure "that information collected for one purpose may not be used for a different purpose without the

individual's consent," remain equally applicable in the online context. *Salazar*, 118 F.4th at 545 (quoting S. 2361, 100th Cong. (1988), and then quoting S. Rep. No. 100-599, at 8). If new types of digital information fall within the purview of the statute, they need not have been considered or even invented at the time the VPPA was passed in order to be covered. "'[T]he fact that [a statute] has been applied in situations not expressly anticipated by Congress' . . . simply 'demonstrates [the] breadth' of a legislative command." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)); *see Wis. Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) ("While every statute's meaning is fixed at the time of enactment, new applications may arise in light of changes in the world.").

The Second Circuit has not directly addressed which types of digital information fall within the scope of the VPPA. *See Salazar*, 118 F.4th at 549 n.10 (noting that "while there may be breathing room in the statute to explore what exactly is 'personally identifiable information . . . we need not and do not explore that argument in this appeal").[10] The Third and Ninth Circuits have adopted a narrow view that the statute prevents only "disclosures of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits." *Nickelodeon*, 827 F.3d at 281–290; *see Eichenberger*, 876 F.3d at 985. These Circuits have held that most digital identifiers are too technical to qualify as PII, while holding open the possibility that a Facebook ID may be useful enough to a lay person to qualify. *See Nickelodeon*, 827 F.3d at 289 n.174, *Eichenberger*, 876

---

[10] In *Salazar*, the Circuit suggested that the personally identifiable information disclosed by the Plaintiff consisted of "(1) his email address, (2) his IP address, and (3) cookies associated with his device." 118 F.4th at 552. The Circuit noted that based on this information, the NBA knew "how to directly reach out to Salazar" and "where his device was." *Id.* Although this discussion is suggestive, the definition of "personally identifiable information" was not at issue in *Salazar*, and the Circuit did not hold that these particular pieces of data constituted personally identifiable information within the meaning of the statute.

F.3d at 986. Some courts in this District have nominally adopted the restrictive Third Circuit

standard, but at the same time have concluded that Facebook IDs clearly qualify as PII. *See*

*Wilson*, 598 F. Supp. 3d at 91–92; *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 287

(S.D.N.Y. 2024). The First Circuit has taken the broadest approach, suggested that the statute

prevents disclosure of information which is "reasonably and foreseeably likely to reveal" an

individual's viewing history. *Yershov*, 820 F.3d at 486. The Court concludes that at minimum,

digital PII includes the type of information Plaintiff alleges Defendant disclosed here.

    Digital identifiers commonly consist of unique strings of numbers or letters which

identify a particular profile, account, or device. An IP address is "'a number assigned to each

device that is connected to the Internet' that permits computer-specific online tracking."

*Nickelodeon*, 827 F.3d at 282. Similarly, a device serial number, device ID number, or unique

device identifier is a unique number that represents a specific device. *See*, *e.g.*, *Ellis v. Cartoon*

*Network, Inc.*, 803 F.3d 1251, 1254 (11th Cir. 2015) (Android ID "is randomly generated when a

user initially sets up his device and should remain constant for the lifetime of the user's

device."). IP addresses and device IDs have been referred to as "static digital identifiers,"

because they often persist over time in a manner that facilitates identification. *See Nickelodeon*,

827 F.3d at 279 n.105.[11] A Facebook ID is a string of numbers and letters that uniquely

identifies the subscriber's Facebook profile. Dkt. No. 1 ¶ 6; *see In re Hulu*, 2014 WL 1724344,

---

[11] Although IP addresses have been referred to in this manner, secondary literature suggests
many devices do not have a single, permanent, static IP address. *See* Joshua J. McIntyre,
*Balancing Expectations of Online Privacy: Why Internet Protocol (Ip) Addresses Should Be*
*Protected As Personally Identifiable Information*, 60 DePaul L. Rev. 895, 899–902 (2011). The
IP address of a particular device may be reassigned over time, or a device may have separate
public and private IP addresses. *Id.*

at *14; *Belozerov*, 646 F. Supp. 3d at 314. An email address, similarly, is a unique string of letters referring to a particular email account.

There are powerful arguments for considering all of these digital identifiers to be PII. These types of identifiers are similar to traditional PII such as addresses, social security numbers, or telephone numbers in that they are uniquely associated with a particular person, location, or device. In the VPPA context, a digital identifier reveals that a request for "specific video materials or services" came from a particular computer, device, or account. Revealing that an online request came from a particular computer or account can be considered functionally equivalent to revealing that a written request came from a particular address or telephone number. *See Yershov v. Gannett Satellite Info. Network, Inc*., 104 F. Supp. 3d 135, 141 (D. Mass. 2015) ("A person's smartphone "address" is an identifying piece of information, just like a residential address."), *rev'd on other grounds*, 820 F.3d 482. The physical address or telephone number does not ipso facto reveal the identity of a specific individual; there may be many people living at the same location. But just as the enterprising investigator or advertiser to whom a physical address is disclosed can use that information to track down the occupant of that address and thus the consumer of the video, so too can the enterprising recipient use digital identifiers to trace video requests to particular devices and therefore to particular individuals who use those devices. *See Adstra, LLC, v. Kinesso, LLC*, 2025 WL 552050, at *2–5 (S.D.N.Y. Feb. 19, 2025) (describing the capability of digital marketing companies to link device numbers and IP addresses to individuals and physical locations). Data brokers and technology companies to whom the information is generally disclosed are readily capable of associating it with other personal information to build a profile of an individual. *Id.* at 487; *see* Marc Chase McAllister, *Modernizing the Video Privacy Protection Act*, 25 Geo. Mason L. Rev. 102, 133 (2017) (noting

that it is "quite easy for recipients of data—particularly sophisticated recipients like Google and law enforcement—tied to an IP address to identify a specific Internet user's identity"). The capability is not necessarily limited to those the size of Meta. Indeed, in the rapidly-evolving technological marketplace, it is not beyond the realm of possibility that an enterprising investigator without the resources of a Meta or Google would be able to develop or deploy the tools necessary to identify a unique individual from the combination of numbers that constitutes an IP address. The misappropriation of information identifying a unique person for purposes other than those for which the information has been disclosed to the video service provider constitutes a privacy harm which appears to be within the scope of the VPPA. *See Salazar*, 118 F.4th at 544–45 (noting that the statute addressed fears someone could build "a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch" (quoting S. Rep. No. 100-599, at 5–6)).

The characterization of a specific type of information as PII cannot turn on whether it would "readily permit an ordinary person to identify a specific individual's video-watching behavior," *Wilson* 598 F. Supp. 3d at 91 (quoting *Nickelodeon*, 827 F.3d at 282–83, 290), or would be of assistance "[t]o an average person," *Nickelodeon*, 827 F.3d at 283. The "ordinary person" standard is a judicial construct. When used with respect to the recipient, it creates an objective measure to determine how information will be understood based on Congress's objectives in passing a statute. In consumer-protection law, for example, courts have evaluated communications from the perspective of an unsophisticated recipient based on the view that the Fair Debt Collections Practice Act is intended to "protect[] all consumers, the gullible as well as the shrewd." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993). The ordinary consumer is the recipient of the information, and the intent of the statute is to protect him from the provider.

The situation with the VPPA is the exact opposite—the ordinary person is the *provider* of the information, and the purpose of the statute is to protect him from the *recipient*. The catalyst for the VPPA was an article written after the reporter obtained the titles of video tapes that Judge Bork had rented. *Salazar*, 118 F.4th at 544. The reporter was neither the "ordinary person" nor was he the "average person." The VPPA is not addressed to measuring the effect that a communication or a disclosure would have on the average recipient. Congress intended to protect renters of video materials from the savvy reporter as well as from the average person. The statutory text makes that clear: an ordinary person would not necessarily have the time, motivation or skill to link a physical address to a person, but physical addresses are protected because they are closely linked to individual identity. Digital identifiers cannot be excluded from the definition of PII simply because a hypothetical "ordinary person" does not understand how to use them.

The Court need not decide whether every type of static digital identifier should be considered PII under the VPPA. Some types of digital PII may require not only investigative effort but also access to proprietary data or legal process to identify a unique individual. That may be what the "ordinary person" standard is really addressing—a test that does not turn on an examination of the average person in society or in the community but on the nature of the information needed to connect the identifier to an individual and whether such information is publicly or widely available. IP addresses can be linked to the subscriber through a court-ordered subpoena, *see, e.g., Strike 3 Holdings, LLC v. Doe*, 329 F.R.D. 518, 520 (S.D.N.Y. 2019) (authorizing subpoena for subscriber to IP address "to identify the particular individual associated with the IP address."), or by the Government in the course of a criminal investigation, *see, e.g., United States v. Vosburgh*, 602 F.3d 512, 527 (3d Cir. 2010) ("The unique nature of the

IP address assigned to Vosburgh on October 25 made his attempts to access the Link fairly traceable to his Comcast account and the physical address to which that account was registered.").  And companies like Meta are purportedly able to conduct similar identifications via proprietary information and technology.  But it is not clear on the record here whether, short of having the authority of the Government (and the requisite suspicion to launch a criminal investigation) or having a legal claim giving rise to the right to obtain a subpoena, the enterprising investigator would be able to link the IP address to a particular individual subscriber.

The type of digital identifier Plaintiff alleges Defendant disclosed here, a Facebook ID, presents an easier case.  Courts have generally recognized that Facebook IDs constitute PII under the VPPA.  *See Lamb v. Forbes Media LLC*, 2023 WL 6318033, at *10 (S.D.N.Y. Sept. 28, 2023) (collecting cases).  A Facebook ID cannot be coherently distinguished from traditional PII such as a physical address.  From the Facebook ID, any person can with a few strokes on the internet access the individual's Facebook profile.  And a Facebook profile, more so than an IP address, is analogous to a physical address in that it either reveals or permits the ready discovery of the "person" renting the video.  The individual's profile "stands in for a specific person." *Robinson*, 152 F. Supp. 3d at 184; *see Czarnionka v. Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022) ("The FID . . .  represents a particular individual.").  The purpose of a profile on Facebook or similar social media sites is to permit individuals to connect with one another.  *See* Facebook, https://about.meta.com/technologies/facebook-app/ (last accessed March 3, 2025) ("Facebook helps you connect with friends, family and communities of people who share your interests.").  It is essential to accomplish this purpose that the profile identify its owner, and in fact this is required by Facebook's Terms of Service.  *See*

33

Meta Terms of Service § 3 https://www.facebook.com/terms?section_id=section_3 (last accessed

March 3, 2025) (requiring the user to "[p]rovide for your account the same name that you use in

everyday life" and "[p]rovide accurate information about yourself").  The profile will generally

identify the user by formal name, nickname, or some other moniker, as well as a constellation of

friends, interests, and interactions.  At that point, the identification of the individual will be

complete.  The disclosure of the Facebook profile will not just make it possible for the recipient

to identify the individual; it will identify the individual.

In other cases, the Facebook profile might not contain a name but will include

information such as the individual's pictures, friends, and interests, or some of them.  *See*

*Eichenberger*, 876 F.3d at 986 ("A Facebook link . . . may very well readily enable an 'ordinary

person' to identify an individual.").  In that respect, too, the Facebook profile is not materially

different from the physical address.  The mere possession of an address may not clarify the

identity of the occupant who accessed video material, but it will provide strong clues.  The

information on the Facebook profile, such as the pictures and perhaps contact information of

friends, is indistinguishable from the information that can be gleaned from the neighborhood

through observation, interviews, and the like, that enables identification of the individual renter

of the video.  In passing the VPPA, Congress clearly intended to protect the privacy of the

individual consumer who rents a video against the enterprising investigator who uses a physical

address to hunt down through interviews, observations, and inferences the identity of the

occupant of the address.  It did not intend to deprive the person who provides what is tantamount

to a virtual address to the same enterprising investigator of the same protection.

Here, Defendant allegedly provided Meta with Plaintiff's Facebook ID and the title of the

prerecorded audio visual material that he requested or obtained from the Website.  Dkt. No. 1 ¶¶

3–5, 24.  Because Facebook IDs are PII, Plaintiff has alleged a prohibited disclosure.  Defendant

contends that a Facebook ID is not "enough to identify a particular person," and that Plaintiff has

not pled that his Facebook account contains any personally identifiable information.  Dkt. No. 19

at 18–20; *see Solomon v. Flipps Media, Inc*., No. 2023 WL 6390055, at *3 (E.D.N.Y. Sept. 30,

2023) ("[P]laintiff needed to allege that her public Facebook profile page contained identifying

information about her in order to state a plausible claim." (citing *Ghanaat*, 2023 WL 5738391, at

*4)).  Defendant appears to suggest that the Facebook account would need to reveal Plaintiff's

name for it to be PII.  However, this argument misunderstands the meaning of PII and its

categorical nature.  PII is that information which is capable of identifying an individual, not

necessarily a proper name.  And the test is categorical.  A name is protected even if it is shared

with numerous others and it would be challenging to link that name to a specific individual.

Similarly here, a Facebook ID is a type of information which qualifies as PII because it is

capable of identifying an individual.  It is PII regardless whether it contains a name or particular

identifying information, and there is no need to wade into the murky issue of exactly how

"identifiable" a particular profile might be.  The violation occurs upon the disclosure of the

Facebook ID itself.  *See Czarnionka*, 2022 WL 17069810, at *4 ("Plaintiff has plausibly alleged

that the FID itself constituted PII. Knowledge of what Facebook might do with the disclosed

information to yield PII is therefore unnecessary.").

> ### D.    Knowing Disclosure of Personally Identifiable Information

Defendant finally argues that Plaintiff "fails to plausibly allege that Defendant disclosed

his PII and that any such disclosure was knowingly done."  Dkt. No. 14 at 20.  Defendant argues

(1) Plaintiff has not alleged the titles of the prerecorded audio visual material he requested or

obtained and the URLs he used to access that material, *id*.; (3) it was the Pixel—not Defendant—

that disclosed his PII, *id.* at 21; and (3) no facts are alleged that Defendant knew that the Pixel

was transmitting a FID or that someone could put the FID into a hyperlink to identify the user, *id.* at 22.

Defendant's first argument was squarely rejected by Judge Engelmayer in *Collins v. Pearson Education, Inc.*, 2024 WL 895316 (S.D.N.Y. Mar. 1, 2024). The defendant there argued, as Defendant here argues, that the complaint was deficient because it did not allege the specific videos the plaintiff requested or obtained, "the dates he requested or obtained these videos, where on [defendant's] website the videos can be found, the disclosed Facebook ID, or the disclosed video title." *Id.* at *3; *see also id.* at *6. The defendant there attacked the plaintiff's use of a hypothetical user to illustrate the functioning of the Pixel, *id.* at *8, much like Defendant does here. The court rejected those arguments and held that plaintiff's allegations were sufficient to support standing and to state a claim. The details requested by the defendant were not needed to show that the plaintiff suffered an injury-in-fact because the complaint alleged that the defendant, "as an across-the-board practice, disclosed to Facebook the plaintiff's Facebook ID and the titles and URLs of the videos he requested or obtained." *Id.* at 281–82. The complaint stated a claim for relief because the plaintiff alleged categorically that when a user clicked on and requested a video, the defendant disclosed to Meta whether a video was requested, the specific video name, the URL, and the digital subscriber's FID. *Id.* at 288; *see also Sellers v. Bleacher Rep., Inc.*, 2023 WL 4850180, at *3 (N.D. Cal. July 28, 2023).[12] The complaint here has similar allegations.

---

[12] In *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277 (S.D.N.Y. 2023), a court in this District stated that the name of the specific video materials disclosed to the third party was "essential information for a VPPA claim." *Id.* at 284. The court's decision, however, did not turn upon the failure to disclose the title of the audio visual material but rather on the fact that the complaint did not allege that the defendant had disclosed any specific video materials accessed by the plaintiff. *Id.*; *see also Sellers*, 2023 WL 4850180, at *3 (distinguishing *Martin*).

Defendant's second argument was cogently rejected by Judge Hellerstein in *Czarnionka v. Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022).  After noting that it was not within the court's province at the motion to dismiss stage to assess the truth of those allegations, the court noted that plaintiff alleged that defendant disclosed subscriber information by installing and maintaining the Pixel on its website.  *Id.* at *3.  It was irrelevant that the PII was submitted because the Pixel "was placed into a user's web browser by Facebook and sends information from the user's web browser directly to Facebook."  *Id.*  "By installing the Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within."  *Id.*

Defendant's third argument was rejected in *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 159 (S.D.N.Y. 2023).  The court there rejected the contention that the complaint was required to allege that the defendant knew or had a way to know what information was saved in a given user's browser such that it would know if PII was being disclosed.  The complaint there alleged that the defendant "took affirmative steps and program[med] the Facebook pixel to collect and transmit information regarding each visitor's on-demand video viewing, and that it did so to profit from advertising and information services, with the understanding that the pixel would transmit users' information to Facebook."  *Id.* at 161.  The court concluded that such allegations were sufficient to alleged that defendant acted knowingly.  *Id.* at 162.

Defendant has offered no reason for the Court to depart from those rulings.  Plaintiff has alleged that Defendant knowingly installed the pixel, knowing that it would transmit his personal information to Facebook.  Dkt. No. 1 ¶¶ 3–5, 23–25, 31.  This is akin to knowingly setting up a video camera to record the people buying videos at your store, knowing that the camera would

transmit to outside journalists.  The fact that the information is provided through a tool, rather than directly, does not make the disclosure any less knowing.  It cannot be argued that the tool, not the agent who installed it, is liable for the disclosure.  And there is no need for Plaintiff to disclose the titles of the videos to know that videos were disclosed.  It would be self-defeating if to bring a VPPA claim, Plaintiff were required to disclose the exact information the VPPA gives him a right to keep private.  Because Plaintiff alleges that "Defendant intentionally installed the Facebook pixel on the [] website to benefit from the transmission of users' personally identifiable information, . . . the knowledge element of the VPPA is satisfied." *Harris v. Pub. Broad. Serv.*, 662 F. Supp. 3d 1327, 1336 (N.D. Ga. 2023); *see Czarnionk*a, 2022 WL 17069810 at * 4; *Belozerov*, 646 F. Supp. 3d at 315 (D. Mass. 2022) (finding knowledge when "defendant chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscriber's FID").

## CONCLUSION

Defendant's motion to dismiss is DENIED.  Plaintiff's motion to strike is DENIED as procedurally improper.

The Clerk of Court is respectfully directed to close Dkt. Nos. 13 and 20.

SO ORDERED.

Dated: March 4, 2025
      New York, New York
                                     LEWIS J. LIMAN
                           United States District Judge