UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Kirk Becker, Objector | Case No. 1:24-CV-04493-LJL |
| | Hon. Lewis J. Liman |
| MARK LEE, on behalf of himself and all others similarly situated, Plaintiff, | OPPONENT KIRK BECKER'S OPPOSITION TO PROPOSED CLASS ACTION SETTLEMENT |
| - against - | |
| SPRINGER NATURE AMERICA, INC., Defendant. | |

RECEIVED
SEP 23 2025
PRO SE OFFICE

## TIMELINESS OF THIS COMPLAINT

The deadline provided by the Notice of Proposed Class Action Settlement for members of this class to file objections to the proposed settlement is September 14, 2025, which is a Sunday.. Fed. R. Civ. P. 6(a)(1)(C) extends the time to the end of the next day that is not a Saturday, Sunday, or legal holiday, which in this case is Monday, September 15, 2025.

Kirk Becker, Pro Se
1015 W William Cannon Dr #208
Austin, TX 78745

Class Member ID: 16491

My objections are detailed later in this document. I do not have an attorney in this case, nor am I being advised or assisted by anybody else in this matter. I do not have the means to attend the Final Approval Hearing, and I do not intend to appear at the Final Approval Hearing.

I certify to the best of my knowledge, information, and belief that this complaint ... complies with the requirements of Rule 11.

(Signature) 09/15/25 (Date)

**Preliminary Statement**

Opponent has been unable to obtain a working PACER account to acquire the documents in this case, and instead relies solely upon the following documents kindly provided to him by Class Counsel.

1) Class Action Complaint (by Plaintiff), ECF Document 1

2) Defendant's Answer, ECF Document 32

3) Defendant's Memorandum Of Law, ECF Document 14

4) Plaintiff's Memorandum Of Law, ECF Document 19

5) Opinion and Order, ECF Document 29

Opponent acknowledges that this document does not comply with the requirements of briefings in the federal courts. He asks the Court to consider the merits of his submission, or alternatively requests that he be granted an opportunity to cure the errors and omissions. *Pro se* Opponent acknowledges that this request for an opportunity to cure is at least partly a request for an extension of time.

**BRIEF SUMMARY OF OBJECTIONS**

**A)** The class includes members who support the publication financially with subscriptions of $29.99 for the content, curation and editorial supervision of its content during a difficult time for the whole publication industry, and there is no indication that we actually want to degrade the operation of one of our favorite websites to the point of compromising it. Whether we include ourselves in or exclude ourselves from the settlement, there is no way for class members to exclude our share of the settlement from the expense to the publication.

At a minimum, class members should be compensated with free subscriptions for a period of time rather than cash payouts.

**B)** The case is improperly analyzed, and the "disclosure" to Meta is not inherently unlawful. Opponent asks this Court to carefully analyze and fully consider the various purposes and uses of the Pixel and their propriety in the context of the VPPA before settling this case..

**C)** The VPPA, at issue in this case, is an accident of history and a quirk of law. There is little to distinguish a list of videos rented and presumably viewed (subject to the VPPA) from a list of books purchased and presumably read (not subject to the VPPA. Accordingly, Opponent asks this Court to rule on the issues in this case prior to settlement, whether as a guideline for future legislation or simply acceptable practices for website proprietors.

**D)** Opponent asks for compensation of $1 or more as deemed appropriate by the Court for his participation in this case.

## Analysis of the Case

### Background

Websites, especially large corporate websites, are complicated endeavors. Web pages, as seen by a visitor, are not stored on a disk as web pages and then simply retrieved from the disk and sent over the internet by a server. Instead, the elements of a web page, which together comprise the content of a web page, are stored in a database and assembled into a web page by a program run by and on the webserver before they are sent to the visitor. Web pages are not written or even composed in the same sense that a powerpoint slide is created, they are generated.

The databases that store the web site's content are frequently larger than any single storage disk, and the database servers cannot possibly locate and retrieve the multiple elements of all the various web pages fast enough to deliver the content to the web servers for distribution to the visitors. Individual servers themselves would be overwhelmed if they were not teamed together to share and balance the load.

The common notion of a webserver is actually collection of serverless components teamed together to retrieve, assemble and send web pages to visitors.

Just as, pre-internet, not every publisher owned and operated its own printing press, most website publishers outsource the physical hosting of their websites to third party data centers. Frequently, they also outsource the production and configuration of their web sites to a combination of front-end (the menus and other visible elements of a web page) and back-end

(the programming and interactions between the servers and the databases) who together create a framework, or at least a content management system, for the publisher to add and update the content on its website.

Many publications even outsource at least some of the articles in their publications to free-lance writers.

In this context, it's not particularly extraordinary for website publishers to also outsource the advertising sales and generation that pays for it all to third parties.

The third party web host is necessarily privy to the visitors and the (video) content that they view, though the actual requests are encrypted these days. Certainly, third party website maintainers are privy to the logs showing content requests, and the logs are necessary to trouble shoot problems with the web server, etc. The web logs, or at least reports from those logs, are also used by the publisher to measure visitor interest in the various content on its website.

Where the website publisher "discloses" information to third parties, and where the third parties are acting for and on behalf of the publisher and performing only those actions that are necessary to the publication, there is no more disclosure than that which occurs when a publisher's employees observe protected information In the normal course of their duties. In the *TransUnion* case discussed by the parties, a debt collector was allowed to mail notices rather than be required to directly employ its own personnel as employees to deliver the notices.

## Argument

Following the above discussion, Defendant's use of the "Meta Pixel" is not inherently unlawful -- there may be some instance in support of Defendant's operations where use of the Pixel would be appropriate. Further, the briefs in this case don't make clear exactly what the pixel was used for by Facebook. According, Oppenent Becker will discuss the general case and leave it to the parties and the Court to apply the general principals, after comment and review by the parties, to the specific case.

At the time the VPPA was enacted, most publications earned their revenue from a combination of subscriptions and advertising, with most of the revenue coming from advertising. Media companies on the web similarly strive to make the majority of their revenue from advertising on their web sites. Opponent does not argue that PII is not an issue with respect to advertising because advertising is critical to the normal operation of website businesses.

**Analysis of the Meta Pixel Usage**

As a preliminary matter, Oppponent Becker suspects that the Meta Pixel does not disclose the name and email address used to sign into the ScientificAmerican.com website; rather, the Meta Pixel discloses the name and address used to sign into the Facebook website. The distinction is unimportant, but it's hard to escape a sense that the Plaintiff is suing the wrong Defendant.

Opponent also strives to distinguish between marketing and advertising. The VPPA, at 18 USC 2710(b)(2)(D)(ii) allows for the disclosure of the subject matter, but not the title or

description, of such materials for the marketing of goods and services directly to the consumer. Even having seen the movie "Superman", Opponent is unclear as to what the subject of the movie "Superman" would be without disclosing its title (a description might be "it has a really rambunctious dog and a drunk sister"). The provision "directly to the consumer" is more clear -- a good or service purchase by the consumer from the video tape service provider.

Marketing is therefore an effort to attract new persons to become readers and/or subscribers to its own publication, or to entice current readers and/or subscribers to continue and further their engagement. Advertising is an effort to persuade existing readers to purchase goods or services of other (fourth) parties unrelated to the publication.

For purposes of discussion, along with the established existence of Plaintiff's scientificamerical.com (hereinafter SciAmer.com) Opponent will also postulate the existence of a second website, AmericanScientific.com (hereinafter AmerSci.com).

***

The VPPA , at 18 USC 2710(b)(2)(E), allows for disclosure "if the disclosure is incident to the ordinary course of business of the video tape service provider", where 18 USC 2710(a)(2) defines ordinary course of business to mean "only ... order fulfillment, request processing, and ....". If the Courts are going to take an expansive view of video tape service providers to include websites, they cannot take a narrow view of order fulfillment and request processing to preclude the necessary operations of websites.

For the purposes of measuring performance and engagement of the website, use of the

Meta Pixel is lawful -- every large website performs similar functions to maintain and evaluate the performance of its website, one way or another, either in-house or outsourced, and any disclosures are incidental to those activities.

"Use of the pixel" by a website is the wrong way to view this subject. Rather "pixel" encompasses programming associated with it, and the critical viewpoint "use of PII (and from which source)", by the pixel, not of the pixel, is relevant to this discussion.

Use of a video provider's PII by the pixel on the video provider's own website to make recommendations "for further viewing" is clearly lawful. However, use of a person's viewing history on Facebook to make recommendations on the SciAm website would be a violation of the VPPA by Meta.

Use of SciAmer.com PII by the pixel for advertising by another site, such as AmerSci.com, would be lawful so long as the ads referred prospective consumers directly to the SciAmer.com website for direct purchase of additional materials, and in the general case so long as the ads weren't too specific. Of course, there would be no violation of the VPPA by AmerSci.com because the PII used by the pixel in this example came from SciAmer.com.

An analogy would be Home Depot and Lowes, where they could use PII from their own customers to recommend generic "tools" or "gardening supplies" on each others' websites based upon their own customers' purchases, but not specific products such as "hammer" or "mulch".

Websites can use an individual's PII to serve ads for any product to that same individual because there is no disclosure of PII, even if the website uses a Meta Pixel process to do so.

However, Meta cannot use PII from Facebook in the programming of it's pixel for use on the Scientific American website.

K.Nk Becker
1015 W William Cannon Dr #208
Austin, TX 78745

CERTIFIED MAIL

9589 0710 5270 1133 7361 84

Retail

U.S. POSTAGE PAID
FCM LG ENV
AUSTIN, TX 78745
SEP 15, 2025

10007

$11.60

RDC 99

S2324Y502479-7

RECEIVED
SEP 22 2025
CLERK'S OFFICE
S.D.N.Y.

RECEIVED
SEP 23 2025
PRO SE OFFICE

USM P3 SDNY

Pro se

Clerk of the Court
U.S. District Court for Southern
District of New York
500 Pearl St,
New York, NY 10007