RECEIVED
NOV 12 2025
PRO SE OFFICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Kirk Becker, Objector<br><br>MARK LEE, on behalf of himself and all others similarly situated, Plaintiff,<br><br>- against -<br><br>SPRINGER NATURE AMERICA, INC., Defendant. | Case No. 1:24-CV-04493-LJL<br><br>Hon. Lewis J. Liman<br><br>RESPONDENT KIRK BECKER'S MEMORANDUM OF FACT AND LAW AND PROPOSED ALTERNATE SETTLEMENT |

# RESPONDENT KIRK BECKER'S MEMORANDUM OF FACT AND LAW AND PROPOSED ALTERNATE SETTLEMENT

At the time he filed his initial objection on 9/14/25, Respondent was unaware that this Court conducted hearings via teleconferencing. At this time, respondent asks to attend the final settlement hearing at 11:00 a.m. on November 6, 2025.

I consent to email filing at this time using the email address batmans_byte@rocketmail.com

I certify that I have concurrently sent a copy of this document to Plaintiff's Counsel at acarney@cbplaw.com and Defendant's Counsel at sharonschneier@dwt.com, and will promptly correct any bounces. I will send paper copies to the proper addresses later today.

I certify that to the best of my knowledge the contents of this document are true and correct to the best of my knowledge, information, and belief and comply in all respects with Fed. R. Civ. P. Rule 11.

/s/ Kirk Becker
Kirk Becker, Respondent

11/04/2025
(Date)

## Table of Contents

Background – Changes in the Publication Industry .......... 3
Background – The Meta Pixel .......... 5
The Damages to Class Members Resulting from Defendant's Unlawful Conduct are Overstated 7
The Benefit to Defendant Resulting from Defendant's Unlawful Conduct is also Overstated .......... 8
Liquidated vs. Actual Damages .......... 9
Liquidated Damages .......... 9
Actual Damages .......... 9
The remedy is inadequate. .......... 10
An Alternate Remedy Should Be Sought .......... 11

**Background – Changes in the Publication Industry**

1. Writers write and readers read. Producers sell and consumers buy. Publishers connect the two pairs, using the producers and consumers to subsidize the writers and readers[1]

2. Last century, pre-internet, the media was supported by a combination of reader subscriptions and advertising. General interest newspapers divided their publications into sections; current critical events and national and world news, state and local news, lifestyle and cultural happenings, sports and classified advertising. Magazines were published less frequently with longer, deeper articles around specialized topics.[2]

1. Advertisers placed their ads in sections of the newspapers and complementary magazines where readers with similar interests were also interested in similar products and services. Print media prospered as an industry.

2. In summary, there is an overlap among readers and consumers, and advertisers were able to target consumers by targeting readers. It worked for a long time, throughout the 20th century.

3. With the widespread availability of the internet, the classified ads that directly connected producers with consumers largely moved to the more direct, cheaper distribution on the internet, cutting out both the paper medium and the print media that supported the writers and readers.

4. As writers and readers followed classified advertising to the internet, the producer/consumer and writer/reader paradigm tended to segment as it did with classified advertising, but the lower cost to publish created intense competition among publishers. The lower cost to publish also allowed for a profusion of advertising, diluting its effectiveness, value to advertisers, and ability to support publishers and writers.

---

[1] This analysis focuses on the print media, relegating TV and movies to a footnote because they aren't pertinent to this suit.

[2] At one time, books were serialized in magazines and newspapers before changes in economics enabled them to carve out their own standalone niche supported entirely by sales rather than subscriptions and without advertising.

5. Shortly thereafter, almost concurrently, many readers switched to social media and its two-way correspondence between readers and writers who became writers and readers.[3] When readers started to follow writers directly rather than content, advertisers lost their ability to target consumers by the content that they read.

6. Search engines had some success selling advertising based on search terms. In some cases, that was easy. If somebody searched for a hammer, they were shown ads for hammers and even building supplies.

7. Companies used quirks in the web page format (html specification) to develop techniques to track readers' interests directly. Each and every reader action on each and every participating website could be aggregated to develop a profile of each web user.

8. Social media, which didn't have a way to target advertising based on the limited range of content on social media, could target advertising to their visitors through the user profiles developed from following people outside the social networks on the larger world wide web.

---

[3] Content suffered from the budget cut, but that's a personal view.

**Background – The Meta Pixel**

10. As noted by Plaintiff, the Meta Pixel collects information from website visitors (Plaintiff's Complaint, EOF 1, page 10, fn 12).

11. The "standard events" collected by the Pixel are pages visited and search, and other data pertaining to the "Sales Funnel"[4] such as Contact, Registration Complete, CustomizeProduct, AddToCart, and Purchase)[5]. *Sharing standard events helps optimize for conversions and build audiences.*[6] These priority actions are collected and managed by other products including Google Analytics[7] and a multitude of Customer Relationship Management (CRM) applications that integrate a website owner's website logs, email, and marketing efforts. There is nothing novel, objectionable, or atypical about Defendant's use of the Pixel for that purpose.

12. The events can also be shared using Meta tools, a companion to the Meta Pixel. "*This sharing improves **your Meta ads** by reaching a relevant audience, personalizing ad experiences, and optimizing ad campaigns for better outcomes.*"[8] [emphasis Respondent's].

13. Defendant doesn't advertise on Meta; there is no need for Defendant to improve its ads on FaceBook or any other Meta sites. Further, revenue from ads on Meta accrue to third-party Meta, not to Defendant Springer.

14. Scientific American does have a page on Facebook. Perhaps Defendant receives a share of the Meta advertising revenue from ads on the Scientific American page on Facebook. Even so, if we think of ads as a commission on a sale, then the amount Defendant would receive from

---

[4] https://www.ibm.com/think/topics/sales-funnel
[5] https://developers.facebook.com/docs/meta-pixel/reference#standard-events
[6] https://www.facebook.com/business/help/964258670337005
[7] https://developers.google.com/analytics/devguides/reporting/data/v1/funnels
[8] https://www.facebook.com/business/help/964258670337005

advertising shown on Defendant's page on Facebook would be only a commission on a commission.

15. Defendant Springer and Meta are not collaborators, they are publishers competing for advertising dollars. Springer gains nothing by sharing its readers' info with Meta.[9]

16. There is a natural assumption that because Springer is sharing its customer data with Meta, there must be a reason for it to be doing so, and they must be gaining some benefit from doing so. However, it seems more likely that somebody at Springer added the Meta Pixel to Defendant's website because it just seemed like a good idea and everybody else was doing it.

17. Business doesn't understand Tech, Tech doesn't understand Business, and it appears that Defendant installed the Meta pixel on its website inadvertently. While inadvertence is often a symptom of negligence, it's not a synonym.

[9] It is another question as to whether retailers gain anything by sharing their data with Meta. Surely, it would be advantageous to show hardware ads to (for example) Home Depot customers when they are on FaceBook, and also to Lowes' customers, but Meta also shows Lowes' ads to Home Depot customers. Whether that kind of advertising is beneficial or detrimental may be product specific, whether the products are durable goods such as hammers or consumables such as nails. Fortunately, while the question may be interesting, there is no need to further consider it here, which is a suit involving a competing publisher rather than an advertiser.

**The Damages to Class Members Resulting from Defendant's Unlawful Conduct are Overstated**

18. Plaintiff complains that "Defendant knowingly disclosed Class members' PII—specifically, their FIDs and URL identifying the prerecorded audio visual material they requested or obtained—to Meta" (Plaintiff's Complaint, EOF 1, page 18, para 62) and that "Plaintiff and Class members have suffered loss by reason of Defendant's violations, including, but not limited to, violations of their right of privacy, loss of value in their personally identifiable information, …" (Plaintiff's Complaint, EOF 1, page 19, para 67).

19. As Plaintiff is aware, Defendant not only disclosed to Meta its Class members' actions when viewing videos, Defendant also disclosed to Meta those same Class members' actions when reading articles. Plaintiff complains of Defendant's disclosure of video viewing activity, but has no lawful basis to complain of the disclosure of article reading activity. Yet the two are largely redundant with each other.

20. Further, Plaintiff and all other Class members are registered users of Meta platforms, which also collect similar data about its users from their interactions on Meta website and on other unrelated websites. Accordingly, the actual losses and/or damages suffered by Plaintiff and Class members due specifically to the unlawful disclosure of the complained of video viewing history are negligible.

**The Benefit to Defendant Resulting from Defendant's Unlawful Conduct is also Overstated**

21. Plaintiff complains of "the inequity of Defendant's enrichment by means [~~of~~] identifying information pertaining to Plaintiff and Class members without authorization or consent" (Plaintiff's Complaint, EOF Doc 1, page 19, para 67) "because its Pixel enabled it to target digital advertising to its subscribers (and potential subscribers) based on the material those subscribers previously requested or obtained on the Website, including audio visual materials" (Plaintiff's Complaint, EOF 1, page 11, para 32.

22. Nowhere in its complaint does Plaintiff make any attempt to quantify the "enrichment" by Defendant resulting from it's use of the Pixel. Further, the record doesn't show any effort by Plaintiff to even discover the quantity or degree of enrichment that accrued to Defendant from Defendant's disclosure of Class Members video viewing history apart from Defendant's disclosre of article reading history.

23. Further, Defendant is not a merchant or retailer, and it doesn't do any advertising on FaceBook or Meta properties, which is Meta's stated purpose of the Pixel (See Background – the Meta Pixel in this document). Rather, Defendant is a competing content provider with its own advertising business, and any information about its visitors that it discloses to competitor Meta is probably counterproductive to Defendant's own publishing business (See Background – Changes in the Publication Industry, this document).

**Liquidated vs. Actual Damages**

**Liquidated Damages**

25. In the "Bork Incident" that gave rise to the VPPA, the titles of 146 videos were disclosed (EOF Doc 1, Pg 5, para 15,16). It was hard to quantify how much damage was actually done to the justice, and Congress set a liquidated damage amount of $2,500.00, which would have been $365,000 for the incident that prompted the law.

26. In this case, with 32,468 class members, even one $2,500 disclosure per class member would amount to liquidated damages of $81,170,000.

**Actual Damages**

27. In this case, there has been no effort made by Plaintiff to quantify the actual damages to Plaintiff by disclosing Class Member's PII to Meta, even in the specific existence of the named Class Representative. Further, there has especially been no effort made by Plaintiff to distinguish damages resulting from unlawful disclosure of Class Members' video viewing history apart from the lawful disclosure of Class Members article viewing history.

28. Plaintiff's failure to show any actual damages to Class Members specifically from Defendant's disclosure of Class Members video viewing history corresponds with its failure to show any enrichment of Defendant from those same disclosures.

**The remedy is inadequate.**

29. The Settlement Agreement pfovides that "*Nothing herein shall prohibit the use of the Meta Pixel where the disclosure of information does not identify specific video materials that a user has requested or obtained*" (*ECF 40-1, Settlement Agreement*). Though the Settlement Agreement prohibits disclosure of video materials, because of the large overlap between video and narrative or pictorial content on the site, the Settlement Agreement accomplishes nothing. Instead, it uses an until recently novel interpretation of the VPPA to "severely punish" Defendant for its inadvertent transgression that bears no similarities whatsoever to the incident that gave rise to the enactment of the VPPA in the first place[10].

30. The monetary consideration amounts to less than a free annual digital subscription to Defendant's publication ($29.99), an amount that Class members willingly pay[11] to support, as well as access, the publication. Further, the overall award diminishes the ability of the publication to produce first-rate content that Class Members seek and pay for in the first place.

31. Further, an adequate remedy should be sought. The Senate Report prepared during the enactment of the VPPA notes that the bill's sponsors "included a similar protection for library borrower records, recognizing that there is a close tie between what one views and what one reads. … However, the committee was unable to resolve questions regarding the application of such a provision for law enforcement" (*Senate Report 100-599, Pg 8*). There are no implications for law enforcement in this case.

---

[10] In its complaint, Plaintiff showed that it could access the demonstration "Kendra Martin" Facebook account, but Plaintiff did not show a list of videos viewed by Kendra Martin on the ScientificAmerican.com website.

[11] A few, many, most Class Members? Respondent doesn't know, and the record doesn't show.

**An Alternate Remedy Should Be Sought**

33. Plaintiffs should seek Defendant's agreement to cease sharing any and all of its visitors' PII and/or actions on its ScientificAmerican.com with any party that does not appear to visitors as ScientificAmerican.com. This would include subsidiaries, affiliates, and business partners of Springer and/or Scientific American so that the Agreement extends even through the day when one company owns everything.

34. In the section "Background – The Meta Pixel" of this document, Respondent shows that Defendant gains little value from that data sharing. Defendant may have a different view of the value that it derives from sharing its visitors' data, but at least at this point Plaintiff hasn't been able to discover it.

35. This proposed remedy matches the penalty (a prohibition against sharing of its visitors' data) with the offense (unlawful sharing of its visitors' data).

36. The Alternate Agreement proposed herein does not contemplate any monetary payments to Class members because they have not suffered any monetary damages and because they will benefit from not having any of their personal information or their use of the ScientificAmerican.com website shared with external parties.

37. Class Counsel has established Venue and Standing for this suit. That's worth something. Class Counsel should have their out-of-pocket costs reimbursed.

38. Respondent proposes to be added as a Class Representative based upon his contributions to this case.

39. The Proposed Settlement Agreement proposes to pay the Class representative approximately 1,000 times the payments to Class members. Clearly, either the payments to Class

members are too low, or the payment to the Class representative is too high. Therefore, this Alternate Settlement Proposal would limit payments to Class representatives to no more than $5,000, which amounts to approximately a month of work at $20/hour.

40. A provision should be negotiated for monitoring Defendant's compliance with the Proposed Settlement.

41. Ordinary Class members should be explicitly excluded from the provisions in Section 10.9 of the Proposed Settlement Agreement constraining comment upon the settlement because they have had no role in negotiating the Agreement.

Mr. K
1015
208
Austin, TX 78745

CERTIFIED MAIL

9589 0710 5270 3356 3542 44

Retail

UNITED STATES POSTAL SERVICE

10007

RDC 99

U.S. POSTAGE PAID
FCM LG ENV
AUSTIN, TX 78745
NOV 04, 2025

$12.42

S2324A502137-9

RECEIVED
NOV 12 2025
PRO SE OF

Pro Se Intake Unit
Daniel Patrick Moynihan United States District Courthouse
500 Pearl Street
New York, NY 10007